**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 92-7030
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JAMES GORDON KELLER,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Southern District of Texas
_____

Before REAVLEY and DAVIS, Circuit Judges, and TRIMBLE,[1] District Judge.

DAVIS, Circuit Judge:

James Gordon Keller was convicted in September 1991, of one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, and ten counts of aiding and abetting the commission of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. The government presented evidence that Keller and several associates created a scheme to obtain money from cancer patients and their families by promising them, by way of interstate telephone conversations, an effective treatment and cure for their cancer. The principal issue on appeal is whether Keller was prejudiced by the government's

_____

[1] District Judge of the Western District of Louisiana, sitting by designation.

failure to disclose the grand jury testimony of one of its witnesses at the time of trial. We conclude that the government's nondisclosure was harmless error and affirm Keller's conviction.

I.

In March 1983, Keller formed the Universal Health Center ("UHC") in Matamoros, Mexico. Keller advertised that the UHC offered "an effective therapeutic approach to the treatment of cancer." Keller's treatment included injections of an amino acid solution called "Tumorex," "lymphatic massages," and "colonic irrigations." Although Keller was a college graduate, he had no medical or scientific training; his degree was in business administration and he spent much of his life working in the water treatment business.

One of Keller's co-defendants, Maxine Lowder, operated Western Health Research, which was a referral and reservation center for the UHC. In telephone conversations, personal conversations, and speeches, Keller and Lowder represented that their "success or cure rate" for cancer patients who were treated with Tumorex and who had not undergone prior conventional medical treatment was between 80 and 100%, and that their success rate for patients who had received conventional medical care was between 40 and 65%. Keller and Lowder also told patients that the United States Government and the American Medical Association ("AMA") were conspiring to keep Tumorex out of the country because it would bankrupt the social security system and the medical profession.

Keller told his patients that, with a device called the "Digitron D Spectrometer," he could detect the location and density of their cancer simply by having them hold a plastic plate attached to the machine. Keller also told his patients that he could diagnose and treat cancer by placing the same plastic plate over a Polaroid photograph of a person. In addition, Keller informed his patients that, by holding a plastic pendulum over a patient's body, he could determine whether they were suffering from cancer and whether they would benefit from certain medications or foods.

Keller was tried before a jury in August 1991.[2] The government presented testimony from two of the eleven patients named in the indictment, as well as testimony from the relatives of the other nine patients who had died. All eleven patients had terminal or incurable cancer, and all had been unsuccessfully treated by conventional medicine before seeing Keller. The patients and relatives testified that they had contacted Lowder, who told them about Keller's treatment methods and his "cure" rates.

The relatives described how Keller examined their family members with the Digitron D Spectrometer and the pendulum. They described the daily injections of Tumorex, the use of Polaroid photographs to diagnose and treat patients, the prescribed diets,

---

[2] Keller co-defendants were tried in 1985. Keller was in Mexico until March 1991, when American agents allegedly abducted him and transported him to the United States. On appeal, Keller has abandoned his argument that the district court lacked personal jurisdiction in light of the Supreme Court's decision in **United States v. Alvarez-Machain**, 112 S.Ct. 2188 (1992).

3

and the "colonic irrigations." The relatives recalled how Keller told their family members that their "cancer was gone" or that they had been "cured." Finally, the relatives reported that their family members had paid Keller between $2500 and $3000 for his "treatment" and "cure" of their cancer.

The physicians who diagnosed and treated the eleven patients also testified. Dr. Bruce Storrs testified that it was generally understood that tumors, once removed, frequently recurred. He also asserted that although a diuretic, such as Tumorex, would reduce the swelling of a tumor temporarily, it would not cure the patient of cancer. Dr. Rand Allen Hock testified that the clinical definition of a "cure" was "five years of disease free survival." Both physicians testified that they were unfamiliar with the Digitron D Spectrometer.

The government also called Dr. Thomas Dorr, a pharmacologist, who had tested Tumorex to determine whether it had any anti-cancer effect. Dr. Dorr testified that his testing had shown that Tumorex had no anti-cancer effect in a dosage administrable to humans. He testified, however, that studies had been published showing that L-arginine, the amino acid in Tumorex, might inhibit the formation of tumors, but that no published studies indicated that Tumorex had any therapeutic effect once a tumor developed.

The government concluded its case by presenting the testimony of FBI Special Agent Robert Nixon, who introduced the death certificates of Keller's patients in an effort to demonstrate the falsity of his alleged "cure" rates. Nixon testified that he had

4

conducted a survey of 103 patients that Keller had treated in 1983, and that by 1985, 78 or 79 of these patients had died, and that by 1991, 91 had died.

In his defense, Keller contended that he had a good faith belief in the effectiveness of his treatment. He presented two expert witnesses who explained the theory underlying the Digitron D Spectrometer, as well as four doctors who testified that Tumorex was an effective anti-cancer agent. Keller also presented testimony on the salutary effects of diet in the prevention and treatment of cancer. In addition, twenty of Keller's former patients testified that neither Keller nor any of his associates promised them a cure or told them that they were cured at the end of their treatment. Finally, Keller testified in his own behalf, stating that he had treated between 180 and 200 patients in 1983. Keller also testified that he did not believe that cancer was "curable," but rather, that it could be controlled for long periods of time if a strict diet was maintained and other parts of his program were followed.

The jury found Keller guilty of one count of conspiracy to commit wire fraud and ten counts of aiding and abetting the commission of wire fraud. The district court denied Keller's motion for "judgment n.o.v." and for new trial.

After filing his notice of appeal, Keller moved this court to compel the government to transcribe and produce Agent Nixon's grand jury testimony which the government had not produced at trial. We granted Keller's motion and remanded the case to the district court

to determine whether the government's failure to produce this alleged Jencks Act material warranted a new trial. Finding that Keller had not been prejudiced by the government's nondisclosure, the district court denied his motion for new trial. Keller challenges this ruling on appeal and contends also that the record evidence is insufficient to support the verdict. We consider both arguments below.

## II.

### A.

Keller argues first that his conviction should be vacated and a new trial ordered because the government failed to produce Agent Nixon's grand jury testimony as required by Fed. R. Cr. P. 26.2.[3] Although Keller moved for the production of all Jencks Act material prior to trial, the district court rejected his argument that untranscribed grand jury testimony was subject to disclosure under Rule 26.2.

In our earlier remand order, we instructed the district court to follow the procedure outlined in **United States v. Rivero**, 532 F.2d 450, 459-61 (5th Cir. 1976), to determine whether the nondisclosure of Nixon's grand jury testimony warranted vacating Keller's conviction and ordering a new trial. The district court's task under **Rivero** was to determine: "whether there is or is not a reasonable possibility that the absence of [the] grand jury testimony affected the outcome of the case or handicapped [the

---

[3] In 1977, Congress placed the substance of the Jencks Act, 18 U.S.C. § 3500, in the criminal rules as Rule 26.2.

6

defendant] or his counsel in their presentation or defense." **Id.** at 461. The district court affirmed Keller's conviction after finding that:

> there is no reasonable possibility that the absence of the grand jury testimony at trial affected the outcome of the case or otherwise significantly prejudiced the conviction in light of the extensive cross-examination at trial on each and every particular raised in the Defendant's Motion to Vacate.

In **United States v. Beasley**, 576 F.2d 626 (1978), **cert. denied**, 440 U.S. 947 (1979), we stated that fidelity to the principle underlying the Jencks Act requires that "'appellate courts should be hesitant to take it upon themselves to decide that the defense could not have effectively utilized a producible statement.'" **Id.** at 629 (quoting **Rosenberg v. United States**, 360 U.S. 367, 375-76 (1959) (Brennan, J., dissenting)). The harmless error standard in this context is quite strict:

> The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence [on the judgment].

**Id.** at 629-30 (quoting **Kotteakos v. United States**, 328 U.S. 750, 764-765 (1946)); **see also United States v. McKenzie**, 768 F.2d 602, 609 (5th Cir. 1985), **cert. denied**, 474 U.S. 1086 (1986). A failure to produce Jencks Act material at trial, however, is harmless error where there is no "substantial inconsistency, contradiction or variation" between the prior statements and the witness' trial testimony. **United States v. Merlino**, 595 F.2d 1016, 1019 (5th Cir. 1979), **cert. denied**, 444 U.S. 1071 (1980); **see also United States v. Welch**, 817 F.2d 273, 274 (5th Cir.), **cert. denied**, 484 U.S. 955 (1987); **United States v. Sink**, 586 F.2d 1041, 1051 (5th Cir. 1978),

7

**cert. denied**, 443 U.S. 912 (1979).  We have carefully reviewed Nixon's grand jury testimony and his trial testimony and find no substantial inconsistency.

In his grand jury testimony given April 30, 1991, Nixon testified that he had surveyed 93 of the patients that Keller treated between March and December 1983.  He stated that of the 93, two did not have cancer before seeing Keller, and two would not talk to him about Keller.  Of the remaining 89 patients, Nixon reported that "as of one year later," 50.56% were dead and 41.47% still had cancer.  We interpret this as an assertion that in 1984, one year after the subjects of Nixon's study had completed their treatment at Keller's clinic, 45 patients had died and 44 were still alive.  Nixon concluded his remarks by noting that: "We have 40-something people that were still alive the last time we checked [presumably in 1984].  We're going to have to get out there and find out if they're still alive."

Four months later, in August 1991, Nixon testified at trial that he had surveyed 103 of Keller's patients, that 91 of the 103 were dead as of the time of trial, and that of the 12 still alive, only three claimed that they had been cured.  During cross-examination, the district court asked Nixon:  "How many of those 93 [sic] had already died by 1985?"  Nixon responded:  "There was --- I think it was like 78 or 79 of them, in fact, back in 1985 that had already died."

Keller maintains that Nixon's trial testimony that 78 or 79 people had died by 1985 conflicts with his grand jury testimony

8

that 45 people had died "the last time we checked." We do not agree. When Nixon testified before the grand jury in April 1991, he explained that he had not updated his research since 1984, and that he would have to do further research to determine how many of the "40-something" patients that were still alive in 1984, had died by 1991. Before testifying at trial in August 1991, Nixon obviously had performed this additional research. At trial, he was able to report that 91 of the 103 patients that he surveyed had died by 1991, a statistic which had not been available when he testified before the grand jury four months earlier.

Having performed the follow-up research as he promised, Nixon undoubtedly knew how many patients had died since he had performed his initial research in 1984. It therefore is reasonable that, at trial, he would have known how many patients had died by 1985. Consequently, when the district judge asked Nixon how many of Keller's patients had died by 1985, he was able to respond: "I think it was like 78 or 79 of them, in fact, back in 1985 that had died."

Keller also maintains that Nixon's grand jury testimony that he surveyed 93 patients conflicts with his trial testimony that he surveyed 103 patients. Again, we disagree. Nixon performed his first survey in 1984, and a follow-up survey between April and August 1991. That Nixon increased the patient base by 10 when he performed his supplemental survey in 1991 creates no inconsistency.

9

B.

Keller argues next that the government presented insufficient evidence to support the jury's finding that he intended to defraud his patients. "In assessing a challenge to the sufficiency of the evidence, we must consider the evidence in the light most favorable to the verdict and must afford the government the benefit of all reasonable inferences and credibility choices." **United States v. Stouffer**, 986 F.2d 916, 921-22 (5th Cir.), **cert. denied**, 114 S.Ct. 115 (1993). The key question is whether a rational jury could have found the essential elements of the crime beyond a reasonable doubt. **Id.**

To sustain a conviction for wire fraud under 18 U.S.C. § 1343, the government must present evidence of (1) a scheme to defraud, and (2) the use of, or causing the use of, wire communications in furtherance of the scheme. **United States v. Dula**, 989 F.2d 772, 778 (5th Cir.), **cert. denied**, 114 S.Ct. 172 (1993). The government also must prove that defendant intended to defraud or deceive his victims. **United States v. St. Gelais**, 952 F.2d 90, 95 (5th Cir.), **cert. denied**, 113 S.Ct. 439 (1992). It is this last element of the offense that Keller contends is not supported by the evidence.

The requisite intent to defraud exists if the defendant acts "knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to [himself]." **Id.** at 96. Also, "proof of intent [to defraud] may arise by inference from all of the facts and circumstances surrounding the transactions." **United States v.**

10

**Shively**, 927 F.2d 804, 814 (5th Cir.), **cert. denied sub nom. Johnson v. United States**, 111 S.Ct. 2806 (1991).

We are persuaded that the facts and circumstances surrounding Keller's claim that he could cure cancer, when combined with his bizarre treatment method, amply support the jury's conclusion. Keller represented that he could "cure" cancer, and told his patients that they were "cancer free" following their treatments. Keller extracted hundreds of thousands of dollars from his patients, which he insisted be paid in cash. Most importantly, the government demonstrated the outrageous nature of Keller's claim that he could diagnose cancer with a plastic pendulum, a Polaroid photograph, and the "Digitron D Spectrometer."

Based on this evidence, the jury could reasonably infer that Keller knew his treatment was ineffective and that therefore he intended to defraud his patients when he told them he could cure their cancer. Moreover, the jury was entitled to conclude that Keller's claims that he could diagnose cancer with a plastic pendulum and a Polaroid photograph were patently false and that Keller knew that they were false.[4]

---

[4] Keller also challenges the denial of his motion for new trial based on the district judge's remarks at sentencing that he thought that Keller believed in his treatment method. Keller contends that the judge's remark indicates that the judge did not believe that Keller had the requisite intent to defraud. Keller, however, neglects to point out that the judge also stated that "from all the evidence before me, I totally and completely concur in the determination of the jury." As our discussion above demonstrates, the evidence presented was sufficient to support the jury's conclusion, and the district judge obviously did not believe the verdict was against the great weight of the evidence. The district court therefore did not err in denying Keller's motion for new trial.

11

III.

Because we find that the government's nondisclosure of Agent Nixon's grand jury testimony was harmless error, and because we find that the government presented sufficient evidence of Keller's intent to defraud, we affirm his conviction.

AFFIRMED.