**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 93-2486

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

MOYOSORE ISMOILA;
SEGUN DEBOWALE; NURATU LAWANSON,

Defendants-Appellants.

* * *

No. 95-20171

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

MOYOSORE ISMOILA,

Defendant-Appellant.

Appeals from the United States District Court
for the Southern District of Texas
November 13, 1996

Before DUHÉ and DENNIS, Circuit Judges, and DUVAL, District Judge.[1]

DUHÉ, Circuit Judge:

Segun Debowale and Nuratu Lawanson were convicted by a jury of conspiracy to commit wire fraud, money laundering, and use of unauthorized access devices, in violation of 18 U.S.C. § 371 (count 1); aiding and abetting wire fraud, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 1343 (counts 2-9); aiding and abetting money laundering, in violation of 18 U.S.C. § 2 and § 1956(a)(1)(A)(i), (a)(1)(B)(i) (counts 10-15); and aiding and abetting the use of unauthorized access devices, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 1029(a)(2) (count 16). Moyosore Ismoila was convicted by a jury of conspiracy to commit wire fraud, money laundering, and use of unauthorized access devices, in violation of 18 U.S.C. § 371 (count 1); aiding and abetting wire fraud, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 1343 (counts 2-9); and aiding and abetting the use of unauthorized access devices, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 1029(a)(2) (count 16). Lawanson was sentenced to a total of thirty-two months imprisonment followed by three years of supervised release. Debowale was sentenced to a total of eighty-seven months imprisonment followed by five years of supervised release, and was ordered to pay $360,689 in restitution. Ismoila was sentenced to a total of sixty months imprisonment followed by three years of supervised release, and was ordered to

---

[1] District Judge of the Eastern District of Louisiana, sitting by designation.

pay $111,008 in restitution. On appeal, the Appellants raise multiple points of error. We affirm the convictions and sentences of Debowale and Ismoila. We reverse the conviction of Lawanson on Count 11, affirm on all other counts, vacate her sentence on Count 11, affirm her sentence on all other counts and render.

## BACKGROUND

The Appellants defrauded various banks and credit card companies by processing hundreds of fraudulent charges on stolen credit cards to obtain cash. They posed as legitimate business owners, which allowed them to obtain the electronic machinery by which they processed false charges to the stolen credit cards.

Before describing the details of the Appellants' scheme, a review of the mechanics of a typical credit card transaction is helpful. The primary victims of the conspiracy are known as issuing banks. Issuing banks are members of VISA and MasterCard, not-for-profit associations of member banks that operate a worldwide communication system for financial transfers using credit cards. Issuing banks issue credit cards to consumers, enabling those consumers to make credit-card purchases at participating businesses. To accept credit cards, businesses must open an account with a merchant bank. Merchant banks, like issuing banks, are members of VISA and MasterCard, but merchant banks have accounts with businesses, not consumers. Once a business is electronically connected with a merchant bank, it can accept a consumer's credit card by processing the credit card through a point-of-sale terminal provided to it by the merchant bank. If the

3

merchant bank approves the sale, it immediately credits the business for the amount of the consumer's purchase. The merchant bank then transmits the information regarding the sale to VISA or MasterCard, who in turn forward the information to the bank that issued the card to the consumer who made the purchase. If the issuing bank approves the sale, it notifies VISA or MasterCard and then pays the merchant bank at the end of the business day. The issuing bank carries the debt until the cardholder pays the bill.

The Appellants opened approximately ten sham businesses and applied for merchant accounts for those businesses with Comdata Corporation, Western Union, Discover Card, and First Interstate Bank of South Dakota. The Appellants used these businesses to defraud the banks and credit card companies in two different ways.

In one method, the Appellants applied for merchant credit card accounts for their sham businesses. At these businesses, the Appellants processed stolen credit cards in sham transactions in exchange for nonexistent merchandise. After these charges were relayed to the merchant banks, those banks then deposited the amount of each charge directly into the Appellants' bank accounts, and the Appellants withdrew the funds.[2]

The Appellants also set up sham check-cashing businesses for

---

[2] The Appellants conducted most of their business through First Interstate Bank of South Dakota, a merchant credit card issuer. First Interstate employed a company named Cherry Payment Systems that signed up merchants for them. Chidi Amaefule, non-appealing co-defendant, was a salesman for Cherry Payments, and as part of his job, he certified that Appellants owned legitimate businesses, thus enabling them to get MasterCard and VISA merchant accounts. The Appellants also defrauded Discover Card, a company that is both a merchant and issuing bank.

4

which they obtained accounts with Comdata and Western Union. At these businesses, the Appellants used the stolen credit cards to purchase "Comcheks" issued by Comdata Corporation or "Flash Cash" checks issued by Western Union. The Appellants then deposited the Comcheks into their business bank accounts or had Western Union deposit the amount of the Flash Cash checks into these accounts, and later withdrew the funds.

The issuing companies became aware of the fraudulent transactions when the holders of the stolen cards complained that they had not made the charges listed on their respective bills. The scheme involved approximately 270 cardholders and 44 different issuing banks. Charges of $539,135 were made on these credit cards at the Appellants' businesses, all but $16,350 of which were confirmed to be fraudulent.

The Government presented the testimony of five credit cardholders, and representatives from Comdata, Western Union, First Interstate, Discover, MasterCard, and four issuing banks. In addition, the prosecution introduced records of 44 issuing banks that reflected account information of 270 cardholders. There was also testimony from the employees of the banks into which the Appellants deposited the proceeds from their conspiracy and the owners of property on which the fraudulent businesses were located. In addition, Special Agent Judy Sly testified as to the details of her investigation, and the Government introduced evidence seized during the execution of a search warrant at one of the businesses. Finally, the Government produced the testimony of Taiwo Oyewuwo,

5

a.k.a. Adetoye Falusi, a member of the conspiracy who pled guilty and agreed to testify for the Government.

**ANALYSIS**

**I.  SUFFICIENCY OF THE EVIDENCE**

Lawanson first asserts that the evidence was insufficient to sustain her convictions.  She was convicted on all counts encompassing four different offenses:  conspiracy (count 1); aiding and abetting wire fraud (counts 2-9); aiding and abetting money laundering (counts 10-15); and aiding and abetting the use of unauthorized access devices (count 16).  The Government concedes that the evidence was insufficient to support Lawanson's conviction on count 11, and thus we reverse her conviction and vacate her sentence on that count.  On all other counts the evidence was sufficient.

A.  Standard of Review

We review the sufficiency of the evidence in "the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury."  United States v. McCord, 33 F.3d 1434, 1439 (5th Cir. 1994) (internal quotations omitted), cert. denied, 115 S. Ct. 2558 (1995).  A conviction must therefore be upheld if a rational jury could have found that the prosecution proved the essential elements of the crime charged beyond a reasonable doubt.  Id.  It "'is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.'"  Id. (quoting United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982),

6

<u>aff'd</u>, 462 U.S. 356 (1983)). This standard of review is the same regardless whether the evidence is direct or circumstantial. <u>United States v. Cardenas</u>, 9 F.3d 1139, 1156 (5th Cir. 1993), <u>cert</u>. <u>denied</u>, 114 S. Ct. 2150 (1994).

B. Discussion

Lawanson concedes that there was sufficient evidence for a reasonable jury to find a conspiracy and that wire fraud, money laundering, and use of unauthorized access devices occurred. She asserts, however, that the Government failed to prove that she knowingly participated in the fraudulent scheme.

1. The Elements of Each Offense

To satisfy the intent requirement of conspiracy, the Government must show that Lawanson knew of the conspiracy and voluntarily joined it, <u>United States v. Chaney</u>, 964 F.2d 437, 449 (5th Cir. 1992), and that Lawanson had the requisite intent to commit the underlying substantive offenses. <u>United States v. Buford</u>, 889 F.2d 1406, 1409 n.5 (5th Cir 1989). Because the Government proceeded under the theory that Lawanson aided and abetted the substantive violations, it is not necessary to prove that Lawanson herself completed each specific act charged in the indictment. The Government must prove, however, that she associated with the criminal venture such that she had the same criminal intent as the principal. See <u>United States v. Murray</u>, 988 F.2d 518, 522 (5th Cir. 1993). "To aid and abet simply means to assist the perpetrator of a crime while sharing the requisite criminal intent." <u>United States v. Jaramillo</u>, 42 F.3d 920, 923

7

(5th Cir.), cert. denied, 115 S. Ct. 2014 (1995).

The intent necessary for wire fraud is the specific intent to defraud or deceive, although proof of such intent can arise "by inference from all of the facts and circumstances surrounding the transactions." United States v. Keller, 14 F.3d 1051, 1056 (5th Cir. 1994) (internal quotations omitted). To convict Lawanson of money laundering, the Government must prove either that she intended to promote the carrying on of an unlawful activity or knew that the transaction was designed to conceal the proceeds of an unlawful activity. United States v. Garza, 42 F.3d 251, 253 (5th Cir. 1994), cert. denied, 115 S. Ct. 2263 (1995). Finally, to convict for use of unauthorized access devices, the Government must prove that Lawanson acted knowingly and with the intent to defraud, although proof of such intent may be established with circumstantial evidence. United States v. Goodchild, 25 F.3d 55, 59-60 (1st Cir. 1995).

## 2. The Evidence

Lawanson essentially makes two arguments. First, she contends that, although her name and apparent signature appear on many of the documents that the Government introduced into evidence, the Government offered no proof that she had actually signed her name on the documents. Second, Lawanson asserts that even if she did participate in some of the transactions described in the indictment as "overt acts,"[3] the Government still failed to prove that this

---

[3]Lawanson concedes that a reasonable jury could have found that "some" of the signatures were genuine.

8

participation was sufficient to show that she had the requisite knowledge and intent required for conviction.

Lawanson points out that the Government did not undertake a handwriting analysis of any of the signatures; that the limited fingerprint analysis did not inculpate her; that no witnesses saw her sign any of the documents; and that there was testimony that her husband, Segun Debowale, had used Lawanson's name as part of the illegal scheme. Lawanson contends that such evidence calls into question whether she signed the documents on which her name appears.

The evidence suggests otherwise. The Government introduced two Texas driver's licenses into evidence, one bearing the name Nuratu Ronke Lawanson and the other bearing the name Abiodun K. Lawanson. Each of these licenses contained a photograph and a signature. A reasonable jury could conclude that both photos were that of Lawanson[4] and that the signatures were her's as well. A jury is entitled to draw its own conclusion as to the genuineness of signatures by making a comparison with an authentic signature. United States v. Jenkins, 785 F.2d 1387, 1395 (9th Cir.), cert. denied, 479 U.S. 855, 479 U.S. 889 (1986); United States v. Cashio, 420 F.2d 1132, 1135 (5th Cir. 1969), cert. denied, 397 U.S. 1007 (1970); Fed. R. Evid. 901(b)(3). In this case, the signature on the driver's licenses bearing Lawanson's picture served as an authentic signature, and by comparison, a reasonable trier of fact

_____

[4]Agent Judy Sly testified that both pictures depicted Lawanson.

9

could determine that Lawanson's signature on the other documents was genuine.

The determination that Lawanson signed the various financial documents is crucial to the jury's finding of guilt because it is her signature on many of the business records that connects her to the fraudulent scheme. First, she filed assumed name certificates as the owner of Cheques Cashed, Designer's Outlet, and ADE Postal Services, three of the phony businesses used to further the scheme. Second, Lawanson applied for merchant credit card accounts with First Interstate Bank of South Dakota for the businesses called Checks Cashed and Designer's Outlet. Again, Checks Cashed and Designer's Outlet were fake businesses, and First Interstate is one of the merchant credit card issuers whose wire transfers to the fake businesses formed the basis of four counts of wire fraud. Third, Lawanson opened bank accounts at First National Bank for ADE Cheques Cashed and at Texas Capitol Bank for Designer's Outlet, two of the banks about which the money laundering counts revolved. An employee of Texas Capital Bank met Lawanson the day after she attempted to wire $7,000 to Nigeria and identified her in court as the signatory on the Designer's Outlet account. Lawanson's signature also appears as maker on many Designer's Outlet checks made payable to Segun Debowale, Nuratu Lawanson, and Chidi Amaefule (all co-conspirators in this scheme). Further, Lawanson's signature appears on the back of some of these checks, indicating that she tendered or cashed these checks. A reasonable jury could find that these signatures on all of these documents match those on

10

the Texas driver's licenses.

Lawanson questions the authenticity of the signatures because a Western Union agent identified Segun Debowale as Lawanson. Lawanson argues that this evidence suggests that Debowale signed Lawanson's name on Western Union's agreement with ADE Cheques Cashed (dba National Cash Express), and, by implication, on other documents. But this evidence cuts both ways. The signature on the two Western Union documents does not appear to match the signatures on Lawanson's driver's licenses and the other documents discussed above. A reasonable jury could therefore conclude, based upon the eyewitness identification of Debowale as Lawanson, that these signatures belonged to Debowale. The jurors could also infer that while the signature on the two Western Union documents belonged to Debowale, the other signatures belonged to Lawanson.[5] Furthermore, there were signatures on other Western Union/National Cash Express documents that did not match Debowale's signature but did match the signatures from Lawanson's driver's licenses.[6]

The Government also introduced other evidence establishing

---

[5]In addition, Lawanson's signature on a Bank One/National Cash Express document does not appear to match those on her driver's licenses. National Cash Express, however, is the business for which Debowale was identified as signing Lawanson's name, giving rise to the inference that he signed these documents and that thus Lawanson signed the others.

[6]The two signatures are quite distinctive. The signatures that belong to Lawanson contain a curved "L" at the beginning of the name Lawanson, while the signatures that belong to Debowale contain a sharp "L" at the beginning of the name Lawanson. Further, the "L" in Debowale's signature of Lawanson's name also matches the "L" that is found in Debowale's signature of his own name.

Lawanson's guilt.  The fact that Lawanson had two Texas driver's licenses, bearing different names and containing different personal information, and operated the phony businesses using different names, is circumstantial evidence of her unlawful intent.  Furthermore, an agent who conducted a surveillance of one of the fake businesses observed Lawanson there on three occasions.  Each of the businesses that Lawanson was directly tied to was involved in processing the stolen credit cards.

Despite the foregoing evidence, Lawanson argues that the Government failed to prove that she had the necessary intent to be convicted of conspiracy and the other substantive charges.  We disagree.  Lawanson asserts that her conspiracy conviction must be reversed because the above evidence establishes that she was "merely present" during the commission of the illegal scheme and that the only evidence tying her to the conspiracy was based on her marital relationship with Debowale.  It is true that a showing of mere presence and association with those participating in a conspiracy is insufficient to prove knowledge of and participation in criminal activity, United States v. Jackson, 700 F.2d 181, 185 (5th Cir.), cert. denied, 464 U.S. 842 (1983), and that a conspiracy cannot be proven solely by a family relationship. United States v. Williams-Hendricks, 805 F.2d 496, 503 (5th Cir. 1986).  That evidence, however, establishes that Lawanson was more than merely present during the conspiracy and that her role in the illegal scheme was not limited to her marital relationship with Debowale.  "[W]hen inferences drawn from the existence of a family

12

relationship or 'mere knowing presence' are combined with other circumstantial evidence, there may be sufficient evidence to support a conspiracy conviction." Williams-Hendricks, 805 F.2d at 503.

Lawanson's assertion that the evidence was insufficient to prove that she had the requisite intent to be convicted of the substantive crimes also lacks merit. Regarding the wire fraud counts, Lawanson herself applied for merchant accounts with First Interstate for two of the fake businesses and she filed assumed name certificates for three of the sham businesses. The Government also introduced evidence of wire communications: stolen or fraudulent credit cards were used to make purchases of nonexistent merchandise, Comcheks, and Flash Cash checks at the businesses to which Lawanson was connected. This evidence is sufficient to allow a reasonable jury to conclude that Lawanson participated in a scheme to defraud and that she used wire communication in furtherance of this scheme. See United States v. Dula, 989 F.2d 772, 778 (5th Cir.), cert. denied, 114 S. Ct. 172 (1993). Further, a reasonable trier of fact could find that Lawanson acted with the specific intent to defraud because unlawful intent to defraud may be proven by circumstantial evidence. See United States v. Aggarwal, 17 F.3d 737, 740 (5th Cir. 1994). The paper trail connecting Lawanson to the phony businesses is sufficient to prove her membership in the scheme to defraud, and once membership is established, a knowing participant is liable for any wire communication that takes place in connection with the scheme.

13

<u>Dula</u>, 989 F.2d at 778.

The Government proved beyond a reasonable doubt that Lawanson aided and abetted money laundering. Specifically, the Government alleged that by depositing the illegally-obtained Comcheks into the bank accounts of the fraudulent businesses and withdrawing funds from these accounts, Lawanson intended to promote an illegal activity and designed to conceal the nature of these proceeds. <u>See Garza</u>, 42 F.3d at 253. The Government may show either that Lawanson knowingly designed to conceal the proceeds of an illegal activity or that she intended to promote the carrying on of unlawful activity. <u>Id.</u>; 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i). To establish that Lawanson designed to conceal the proceeds of an illegal activity, the Government must prove more than just innocent money spending, although it is sufficient to show that the transaction is part of a larger scheme designed to conceal illegal proceeds. <u>United States v. Willey</u>, 57 F.3d 1374, 1385-86 (5th Cir.), <u>cert. denied</u>, 116 S. Ct. 675 (1995). Intent to promote the illegal activity can be established by showing the defendant used the illegal proceeds to promote the unlawful scheme by presenting herself as a legitimate business owner. <u>See United States v. Alford</u>, 999 F.2d 818, 824 (5th Cir. 1993). Lawanson opened up two separate bank accounts for three of the phony businesses; attempted to wire $7,000 to Nigeria; signed many checks payable to herself and co-conspirators; and owned businesses into whose bank accounts the Comcheks were deposited. This evidence is sufficient to prove both that the bank transactions were part of a

14

larger scheme designed to conceal the illegal activity and that Lawanson promoted the unlawful endeavor by presenting herself as a legitimate business owner. The multiple transactions were part of an overall scheme designed to conceal the illegal proceeds in that the proceeds generated by one phony business run by one co-conspirator were often deposited in the bank account of another sham business owned by a different co-conspirator. In addition, by depositing the Comcheks into the bank accounts, Lawanson gave the appearance that she was operating a legitimate business by accepting Comcheks in exchange for merchandise, when in reality there was no purchase of goods and only a deposit of illegal funds. In fact, the entire scheme was premised on the fraud that Lawanson and her co-conspirators were operating legitimate businesses, because this influenced the banks and merchant credit card companies to do business with the conspirators.

Finally, the evidence is sufficient to convict Lawanson of aiding and abetting the use of unauthorized access devices. Stolen credit cards are one type of unauthorized access device, 18 U.S.C. § 1029(e)(1), (e)(3); United States v. Jacobowitz, 877 F.2d 162, 165 (2d Cir.), cert. denied, 493 U.S. 866 (1989), and the Government produced ample evidence that stolen credit cards were used at the sham businesses. Proof that Lawanson herself used the specific credit cards described in the indictment is not necessary because the Government proceeded under the theory that Lawanson aided and abetted in the use of stolen credit cards. The Government was simply required to prove that Lawanson became

15

associated with, participated in, and in some way acted to further the use of the stolen credit cards. See United States v. Chavez, 947 F.2d 742, 746 (5th Cir. 1991). Although the Government must prove that Lawanson acted with the intent to defraud, such intent may be proven by circumstantial evidence. Goodchild, 25 F.3d at 60. The extensive paper trail tying Lawanson to the phony businesses satisfies all of the necessary elements. See Chavez, 947 F.2d at 746 (noting that the same evidence will typically support both a conspiracy and an aiding and abetting conviction).

## II. ADMISSION OF BANK RECORDS

The Government offered and the court admitted records from 44 banks regarding 270 credit card customers containing, among other things, customers' statements that their credit cards were stolen. The records were introduced through fraud investigators from Chase Manhattan Bank, Discover, AT&T Universal, Citibank, and MBNA American National Association (five of the issuing banks).

All three Appellants argue that the district court erred by admitting these documents, because they contained hearsay, and in some instances, double hearsay, and therefore violated their Sixth Amendment right to confront witnesses. We review a district court's evidentiary rulings for abuse of discretion. United States v. Moody, 903 F.2d 321, 326 (5th Cir. 1990). Confrontation Clause errors are subject to harmless-error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 680-82 (1986); United States v. Stewart, 93 F.3d 189, 194 (5th Cir. 1996). We see no abuse of discretion.

There were essentially two types of records in which the

16

hearsay statements appeared.[7]  First, the Government introduced letters and affidavits from the cardholders stating that their cards had been lost, stolen, or not received, and that their account bills contained unauthorized charges.  Typically, these affidavits were standard forms sent by the credit card issuers to the cardholders, who in turn filled out the affidavits and returned them to the issuing banks.  In some cases, the cardholders themselves wrote letters to the issuing banks stating that their bills contained unauthorized charges.  Along with the affidavit or letter, some cardholders also returned a copy of their bill on which they marked the fraudulent charges.

Second, the Government introduced computerized printouts generated by the issuing banks.  These printouts were essentially reports of phone calls made by cardholders to bank personnel in which the cardholders informed the bank that their credit cards were lost, stolen, or had never been received.  The cardholders relayed this information orally to the bank personnel, who in turn entered the statements directly into the bank's computer.

The Appellants objected to the admissibility of these records as hearsay. The cardholders' affidavits and letters are hearsay because they contain the out-of-court statements of the credit cardholders.  The computer records containing the oral statements are double hearsay.  The first level of hearsay is the oral statements made by the cardholders to the bank personnel.  The

_____

[7]The parties agree that the statements at issue are hearsay; they disagree as to whether they are admissible under exceptions to the hearsay rule.

17

second level of hearsay consists of the bank records themselves that were created when the bank employees recorded the oral statements of the cardholders. The district court admitted the records under the business records exception, Fed. R. Evid. 803(6), and, to the extent that such records contained double hearsay, the "catch-all" or "residual" exceptions, Fed. R. Evid. 803(24) and Fed. R. Evid. 804(b)(5). The district court admitted the documents only after hearing testimony concerning them from five cardholders and five bank custodians.

Read literally, the Confrontation Clause could bar the use of all out-of-court statements in a criminal case when the declarant is unavailable, but the Supreme Court has rejected such an extreme interpretation of the Clause. Idaho v. Wright, 497 U.S. 805, 814 (1990); Sherman v. Scott, 62 F.3d 136, 140 (5th Cir. 1995), cert. denied, 116 S. Ct. 816, 116 S. Ct. 1279 (1996). In Ohio v. Roberts, the Court noted that "when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.'" Ohio v. Roberts, 448 U.S. 56, 66 (1980). The Court later "clarified the scope of Roberts," noting that the case "stands for the proposition that unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a judicial proceeding." White v. Illinois, 502 U.S. 346, 354 (1992); accord Sherman, 62 F.3d at 140.

18

Hence the relevant inquiry in this case is whether the evidence bears adequate indicia of reliability. Evidence is considered reliable if it falls within a firmly rooted hearsay exception or is otherwise supported by a showing of particularized guarantees of trustworthiness. Roberts, 448 U.S. at 66; United States v. Flores, 985 F.2d 770, 775 (5th Cir. 1993). The business records exception is a firmly rooted hearsay exception. United States v. Norton, 867 F.2d 1354, 1363 (11th Cir.), cert. denied, 491 U.S. 907, 493 U.S. 871 (1989). Residual or catch-all exceptions generally are not. Wright, 497 U.S. at 817. Therefore, if the records are admissible under the business records exception, no violation of the Confrontation Clause occurred. If, however, the records are admissible under the residual exceptions, they must be supported by particularized guarantees of trustworthiness to avoid offending the Confrontation Clause.

A.  The Business Record Exception

The Appellants challenge the admissibility of the records under the business records exception on the ground that the cardholders were not acting in the regular course of business when they made the oral statements to the bank employees and supplied the affidavits or letters to the issuing banks. We agree with the Appellants that neither the cardholders' oral statements nor their written affidavits and letters fall within the business records exception, Fed. R. Evid. 803(6). The business records exception does, however, encompass one level of hearsay:  the bank records themselves and the computer recordation by bank personnel of the

19

oral statements of the cardholders.

The cardholders statements do not qualify as business records of the cardholders because the business records exception "applies only if the person who makes the statement 'is himself acting in the regular course of business.'" Rock v. Huffco Gas & Oil Co., Inc., 922 F.2d 272, 279 (5th Cir. 1991) (quoting Florida Canal Industries, Inc. v. Rambo, 537 F.2d 200, 202 (5th Cir. 1976)). As the Appellants correctly point out, it is not the regular course of business for credit cardholders to fill out affidavits or otherwise give information to their banks regarding stolen credit cards. See United States v. Davis, 571 F.2d 1354, 1359 (5th Cir. 1978).

Second, the statements are not admissible as business records of the issuing banks because of the double hearsay involved.

> Double hearsay exists when a business record is prepared by one employee from information supplied by another employee. If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6). However, if the source of the information is an outsider, Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have.

United States v. Baker, 693 F.2d 183, 188 (D.C. Cir. 1982) (citing United States v. Davis, 571 F.2d 1354 (5th Cir. 1978)). In the present case, the cardholders--outsiders to the companies that generated the documents--were the sources of the information contained in the records. So although Fed. R. Evid. 803(6) provides an exception for one level of hearsay--that of the documents themselves created by the employee who recorded the

20

cardholder statements--the sources of the information contained in the records were the cardholders, and their statements must fall within another hearsay exception to be admissible.[8] See Baker, 693 F.2d at 188.

The Government cites many cases that affirm the admission, under the business records exception, of a company's business records containing statements provided by outsiders. These cases, however, all involve situations in which the double hearsay problem was satisfied either by the use of multiple hearsay exceptions or because the outsider who provided the statements was also acting in the regular course of business. See, e.g., United States v. Goodchild, 25 F.3d 55, 60 (1st Cir. 1994).

B. The Residual Exceptions

Although the statements of the cardholders do not qualify as business records, both the written affidavits and the oral statements made to the bank personnel are admissible under the residual exceptions to the hearsay rule, Fed. R. Evid. 803(24) and 803(b)(5). The residual exceptions authorize the admission of hearsay statements having "circumstantial guarantees of trustworthiness" equivalent to those of the other enumerated

---

[8]The record shows that the documents themselves satisfy the requirements of Fed. R. Evid. 803(6). For example, Maureen Lentz, a fraud investigator with AT&T Universal Card, testified that an AT&T employee would take a report over the telephone from a cardholder and enter that information into the computer, that the computer records are records that "AT&T Universal would keep in the normal course of business," that they are "records that AT&T Universal would rely on in the regular course of business," and that the "records contain information that were made at or near the time of the events depicted therein by a person with knowledge."

hearsay exceptions, as long as the trial court determines that the statements are sufficiently material, probative, and in the interests of justice. Fed. R. Evid. 803(24), 804(b)(5).

To satisfy the dictates of the Confrontation Clause, the evidence must be sufficiently reliable, that is, it must be supported by a showing of particularized guarantees of trustworthiness. Roberts, 448 U.S. at 66. These particularized guarantees of trustworthiness must be drawn from the totality of the circumstances surrounding the making of the statement, but they cannot stem from other corroborating evidence. Wright, 497 U.S. at 820-22; Scott, 62 F.3d at 140 & n.2. Although the Supreme Court's language in its decisions interpreting the Confrontation Clause regarding trustworthiness and reliability appears similar to the requirements set forth in the residual hearsay exceptions, we note that the two inquiries are not identical and that evidence admissible under the residual exceptions may still violate the Confrontation Clause. Wright, 497 U.S. at 814; United States v. Shaw, 69 F.3d 1249, 1253 (4th Cir. 1995).

The written affidavits of the cardholders and the oral statements made by the cardholders to the banks exhibit a high degree of reliability such that admission does not offend the Confrontation Clause. The Appellants impugn the reliability of the cardholders' statements on the grounds that the statements are self-serving because the cardholders, by informing the banks that they had not made specific charges, were able to avoid paying for those charges. The record, however, suggests otherwise. A fraud

22

investigator at Citibank with 22 years of experience testified that he had participated in over 1000 fraud investigations and that he could remember only three or four instances in which the cardholder was lying about not making the charges.  In addition, the record shows that issuing banks have an incentive to ensure the veracity of the cardholders' claims of fraud because loss due to fraud is borne by the issuing banks.  We thus believe that the affidavits of the cardholders and the oral statements made to the bank personnel exhibit a degree of reliability similar to that of the statements judged admissible in United States v. Simmons, 773 F.2d 1455, 1460 (4th Cir. 1985) (holding that the admission, under Rule 803(24), of an ATF gun certification form that had been filled out and signed by a weapon manufacturer did not violate the Confrontation Clause because the form was highly reliable).

In addition, the trustworthiness of the statements at issue is so clear from the surrounding circumstances that cross-examination of the 265 non-testifying cardholders would be of marginal utility. See Wright, 497 U.S. at 820, Shaw, 69 F.3d at 1253.  In this case, the trial court delayed ruling on the admissibility of the hearsay statements until after the Government had presented the testimony of five of the cardholders whose statements are at issue.  The Appellants' cross-examination of these witnesses was minimal, and they did not make an issue of whether these witnesses were being untruthful.  Finally, none of the Defendants in closing argument attacked the credibility of the cardholders; the crux of the defense was not whether the cards had been stolen.  We thus

23

conclude that there was sufficient indicia of reliability supporting the out-of-court statements by the credit cardholders such that admission of these statements under the residual exceptions to the hearsay rule does not violate the Appellants' Sixth Amendment right to confront witnesses.

## III. CONDITION OF SUPERVISED RELEASE

Debowale asserts that his Fourth and Fifth Amendment rights were violated by a condition of his supervised release that requires him "to provide the probation officer access to any requested financial information."  We disagree.

Title 18 U.S.C. § 3583(d) allows the district court to order any condition of supervised release that "it considers to be appropriate," so long as that condition:

> (1)  is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);
> (2)  involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and
> (3)  is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a).

18 U.S.C. § 3583(d).

The Sentencing Commission policy statements specifically contemplate a condition of supervised release such as the one imposed in this case.  Section 5B1.4(b)(18) provides:

> If the court imposes an order of restitution, forfeiture, or notice to victims, or orders the defendant to pay a fine, it is recommended that the court impose a condition requiring the defendant to provide the probation officer access to any requested financial information.

U.S.S.G. § 5B1.4(b)(18) (emphasis added). The district court ordered Debowale to pay restitution of $380,689.23.  The court's

24

requirement that he provide access to any requested financial information is thus not only "consistent with," but is identical to, the policy statement promulgated by the Sentencing Commission.

## IV.  THE SENTENCING CHALLENGES

We review the district court's application and legal interpretation of the sentencing guidelines de novo, United States v. Domino, 62 F.3d 716, 719 (5th Cir. 1995), and its findings of fact for clear error.  United States v. Hooker, 997 F.2d 67, 75 (5th Cir. 1993).

### A.  Leadership Role

Debowale and Ismoila contend that the district court erred by increasing their base offense levels by four levels for being leaders or organizers pursuant to U.S.S.G. § 3B1.1(a).  Debowale maintains that the evidence is insufficient to show that he was a leader or organizer, and Ismoila asserts that the evidence does not show that the scheme involved five or more participants. We review for clear error.  United States v. Gonzalez, 76 F.3d 1339, 1345 (5th Cir. 1996); United States v. Valencia, 44 F.3d 269, 272 (5th Cir. 1995).  A finding is not clearly erroneous if it is plausible in light of the entire record.  Valencia, 44 F.3d at 272.  The district court's finding that Debowale and Ismoila were leaders or organizers under § 3B1.1 was not clearly erroneous, and thus we affirm.

To apply § 3B1.1(a), a court must find that the defendant was the leader or organizer of a criminal activity, and that the criminal activity involved five or more participants.  A

25

defendant's role in a criminal activity for the purposes of § 3B1.1 can be deduced inferentially from the available facts. Gonzalez, 76 F.3d at 1345.

The Presentence Investigation Report ("PSR") establishes that Debowale was a leader or organizer of the criminal activity. See Gonzalez, 76 F.3d at 1346 ("Because the PSR has sufficient indicia of reliability to support its probable accuracy, it may be considered as evidence by the trial court at sentencing."). The PSR indicated that Debowale was the leader and organizer of over five individuals who used the phony businesses to process false charges to stolen credit cards. The evidence showed that Debowale leased the premises located at 9914 South Gessner and 5905 South Gessner in Houston, the places of business of seven of the fraudulent businesses. Debowale himself owned many of the businesses, and split the proceeds received from the stolen cards on a 50/50 basis with the possessor of the stolen cards. The PSR also indicates that Debowale had Nuratu Lawanson and Evelyn Olubiyi working directly under him, as he instructed them to deposit money into different bank accounts to conceal the scheme. Further, evidence showed that Debowale often used Lawanson's name when dealing with a company that he defrauded. As part of the criminal activity, Debowale also worked with Emmanuel Obajuluwa, a co-possessor of Nationwide Check Cashing, and Busari Danian, who operated Vantage Computers, two of the front businesses involved in the conspiracy. Debowale used the services of Chidi Amaefule, who, as an employee of Cherry Payment Systems, represented to First

26

Interstate Bank that Debowale's fraudulent businesses were legitimate.

Ismoila's claim that the scheme did not involve at least five individuals is similarly without merit. He relies on United States v. Barbontin, which held that a minimum of five participants must be involved in the precise transaction underlying the conviction. 907 F.2d 1494, 1497-98 (5th Cir. 1990) (referring to such individuals as "transactional participants"). Specifically, Ismoila contends that individuals identified by Taiwo Oyewuwo, a co-conspirator who testified for the Government, did not rise to the level of transactional participants. Oyewuwo testified that he observed three Nigerians known only as "Charlie," "Wale," and "Stone," present fraudulent credit cards to Ismoila. Ismoila contends that because these three people were not linked to any precise credit card transaction, they are not transactional participants under Barbontin.

Since Barbontin, however, decisions by this Court based upon revisions to the Sentencing Guidelines have more broadly defined what constitutes a transaction. The introductory commentary to Chapter Three, Part B of the Sentencing Guidelines, effective November 1, 1990, provides:

> The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), i.e., all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction.

U.S.S.G. § 3B1.1 introductory comment (emphasis added). This Court has held that a transaction is thus defined not by the contours of

27

the offense charged, but by the parameters of the underlying scheme itself. United States v. Mir, 919 F.2d 940, 945 (5th Cir. 1990).

Based on this definition of transaction, "Charlie," "Wale," and "Stone" qualify as transactional participants under § 3B1.1. While the three individuals may not have been tied to any of the counts on which Ismoila was convicted, they were participants in the underlying scheme itself. See Mir, 919 F.2d at 945. And although there is no direct evidence that "Charlie," "Wale," and "Stone" took orders from Ismoila, this can be inferred from the available evidence. See Gonzalez, 76 F.3d at 1345.

Oyewuwo also identified other individuals who participated in the conspiracy under Ismoila's leadership. Oyewuwo testified that Ismoila instructed him to set up a business known as Atom Auto & Repair, for the purpose of accepting fraudulent credit cards. He also stated that Ismoila arranged for Grace Eyikogbe, a fugitive at time of trial, to open bank accounts for Main Check Cashing, one of the businesses that processed fraudulent credit cards. Such testimony establishes that Ismoila was in fact a leader or organizer of a criminal activity that involved five or more participants.[9]

B. Intended Loss Versus Actual Loss

Ismoila argues that in assessing his offense level under

---

[9]Ismoila also claims that reliance on Oyewuwo's testimony is an abuse of discretion because such testimony is false, uncorroborated, and unreliable for the purposes of § 3B1.1. This assertion is without basis in fact and it was not clear error for the district judge to rely on Oyewuwo's testimony. See Gonzalez, 76 F.3d at 1345.

28

U.S.S.G. § 2F1.1, the district court erred by holding him accountable for intended loss instead of actual loss. We affirm.

In the PSR, the probation officer recommended a seven-level increase for Ismoila's specific offense characteristics under U.S.S.G. § 2F1.1(b)(1)(H), based on a loss of $146,245. The Government objected to this calculation, asserting that the probation officer failed to include the intended loss in its loss calculation. The intended loss consisted of credit card charges of $85,203 and $6,200 that were attempted at Atom Auto and Main Check Cashing--charges that the credit card companies declined to process. With the inclusion of the attempted charges, the total loss amount is $237,648, resulting in an eight-level increase, under § 2F1.1(b)(1)(i).[10] At the sentencing hearing, Ismoila objected to the Government's objection to the PSR.

Loss determinations are reviewed for clear error; as long as the determination is plausible in light of the record as a whole, clear error does not exist. United States v. Sowels, 998 F.2d 249, 251 (5th Cir. 1993), cert. denied, 114 S. Ct. 1076 (1994). In addition, the loss "'need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.'" United States v. Chappell, 6 F.3d 1095,

---

[10]In arriving at its figures, the Government did not include all of the attempted charges on each specific card, only the highest one. Often, participants in this scheme would process a credit card through the point-of-sale terminal, only to have that fraudulent sale be rejected. The participant would then use that same card, but with a lesser dollar amount. The Government asserts that in its calculations, it used only the highest attempt per credit card, and not every failed attempt.

1101 (5th Cir. 1993) (quoting U.S.S.G. § 2F1.1 cmt. 8), cert. denied, 114 S. Ct. 1232, 114 S. Ct. 1235 (1994). Further, comment 7 to § 2F1.1 states that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1 cmt. 7; see also Chappell, 6 F.3d at 1101. The Government was able to determine the intended loss, which was greater than the actual loss, and therefore the district court's sentencing determination based on the attempted loss was correct.

Ismoila relies on Sowels for the proposition that intended loss calculation for stolen credit cards is determined by the maximum available credit limit on each card because that is the amount of loss for which the cardholder is at risk. Sowels, 998 F.2d 251-52. Ismoila contends that the charges were declined because they were in excess of the credit card limit, and thus the cardholder was not exposed to such a large loss. See also United States v. Wimbish, 980 F.2d 312, 315 (5th Cir. 1992) (calculating the loss value of stolen and forged checks as the entire face value of those checks, and not the actual amount obtained, because the defendant put his victims at risk for the whole amount of the check), cert. denied, 113 S. Ct. 2365 (1993).

Sowels, however, actually holds that available credit limit can be used as a measure of loss when the credit cards were stolen but not used. See Sowels, 998 F.2d at 252 ("[T]his case is unique because it involves an uncompleted offense."). By basing its loss calculation on the available credit limit, the Sowels Court

30

satisfied the dictates of comment 7 to § 2F1.1, which states that intended loss will be used if it can be determined. Available credit is simply one way of determining intended loss. In this case, however, Ismoila actually attempted to make charges with the credit cards, and using the dollar amounts of the attempted charges is more accurate than using maximum available credit in determining the loss that Ismoila intended to inflict. Cf. Chappell, 6 F.3d at 1101 (determining the intended loss of fifty-one blank checks to be the average of the value of the checks actually recovered). The fact that the victims were not at risk for the charges above their credit limit is not dispositive. The intent of Ismoila is critical, however, as the plain language of comment 7 makes clear. He intended his victims to suffer losses equal to a total of $237,648. He should not be rewarded because some of the charges were over the available credit limit. See United States v. Robinson, 94 F.3d 1325, 1328 (9th Cir. 1996) (stating that "§ 2F1.1 does not require the loss the defendant intended to inflict be realistically possible"); cf. United States v. Brown, 7 F.3d 1155, 1159 (5th Cir. 1993) (finding that intended loss included two $2,000 checks that the defendant did not cash due to police vigilance because defendant "should not be rewarded simply because law enforcement officials thwarted his plans"). The district court's inclusion of intended loss was not error.

C. Obstruction of Justice and Upward Departure

The district court increased Ismoila's total offense level by four levels--two for obstruction of justice under § 3C1.1 and two

31

by upward departure under § 5K2.0--because Ismoila and his wife hid a co-defendant, Grace Eyikogbe, during trial and because Ismoila advised Eyikogbe to flee.  Ismoila asserts that the evidence is insufficient to support the two-level obstruction of justice enhancement, and departing upward by two additional levels was error, because his conduct was not substantially in excess of that which is ordinarily involved in the offense and because the Guidelines already take such conduct into account.  We disagree.

### 1.  Obstruction of Justice

We review for clear error.  United States v. Storm, 36 F.3d 1289, 1295 (5th Cir. 1994), cert. denied, 115 S. Ct. 1798 (1995).

The Government presented evidence that Ismoila and his wife, Tayo Ismail, hid Grace Eyikogbe at their home while Ismoila was in jail during the trial.  After the trial, FBI agents found Eyikogbe and Ismail hiding in the attic of Ismoila's house, and Ismail was subsequently charged with harboring a fugitive.  As part of Tayo Ismail's plea agreement, the Government questioned her under oath and presented this testimony at Ismoila's sentencing hearing.  Ismail testified that when Ismoila called her at home from jail, she told him that Eyikogbe was present at Ismoila's home.  Ismail further stated that Ismoila told her to place Eyikogbe into a motel because he could be criminally charged for having Eyikogbe at his house.  Ismail's testimony was bolstered by telephone records produced by the Government confirming that Ismoila had indeed called home while he was in jail.  Ismoila contends that it is hardly unusual for a person who is jailed to call home and that his

32

wife's testimony does not establish that he obstructed justice, only that he knew that Eyikogbe was present at his home.

The district court properly enhanced Ismoila's sentence. The PSR concluded, and the evidence at the sentencing hearing shows, that Ismoila knew that his co-defendant, a fugitive, was present in his home during the trial. This evidence is certainly enough to support a two-level enhancement for obstruction of justice.

### 2. Upward Departure

In addition to the two-level enhancement pursuant to § 3C1.1, the sentencing court departed upward an additional two levels pursuant to U.S.S.G. §§ 5K2.0 and 5K2.2. "We employ an abuse of discretion standard when reviewing the process used by the trial court in sentencing." United States v. Wylie, 919 F.2d 969, 980 (5th Cir. 1990). We review a district court's decision to depart from the guidelines for abuse of discretion, and such a departure will be upheld if the district court provided acceptable reasons for the departure and if the extent of the departure was reasonable. United States v. Rosogie, 21 F.3d 632, 634 (5th Cir. 1994). The reasons given by the trial court are findings of fact, which we review for clear error. Id.

A court may depart even if the factor is taken into consideration by the guidelines, "only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense." U.S.S.G. § 5K2.0. This Court has developed a two-pronged test to determine whether a departure is justified: (1) whether the circumstances were considered by the

guidelines, and (2) whether the circumstances are of a sufficient magnitude and have a basis in fact. Wylie, 919 F.2d at 980.

The Government argues that the obstruction of justice enhancements in the guidelines do not take into account the seriousness of Ismoila's offense because Ismoila actually obstructed justice in two ways: (1) harboring a fugitive co-conspirator, and (2) urging her to flee the Houston area. The Government also contends that hiding Eyikogbe was such a serious infraction as to warrant departure because it allowed Ismoila to present a defense at trial that blamed Eyikogbe, all the while he was concealing her in his house. Ismoila, on the contrary, asserts that the § 3C1.1 of the guidelines adequately punish him for obstruction of justice.

The facts discussed above are adequate to support a two-level upward enhancement. See Rosogie, 21 F.3d at 634 (departing upward because the guidelines did not adequately account for defendant's criminal history and use of aliases); United States v. Barakett, 994 F.2d 1107, 1112-13 (5th Cir. 1993) (departing upward on bank fraud convictions because of the extended time period over which the fraud occurred, the large number of victims, and the substantial amount of planning), cert. denied, 114 S. Ct. 701 (1994). Reliance on these facts was not clearly erroneous, and the district court did not abuse its discretion.[11]

---

[11]Ismoila also asserts that the district court failed to give him adequate opportunity to present information regarding the four-level increase for obstruction of justice and upward departure, as required by U.S.S.G. § 6A1.3(a). Ismoila claims that he was not given notice of the Government's intention to tender exhibits at

34

D. Restitution

Ismoila also asserts that the district court erred by ordering him to pay $111,008 in restitution arguing that it failed to resolve all factual disputes regarding the amount of restitution pursuant to Fed. R. Crim. P. 32; failed to consider his indigence pursuant to § 3664(a); and incorrectly held him jointly and severally liable for the entire amount of loss. None of these claims has merit.

First, the factual findings by the district court were

the sentencing hearing. Because Ismoila failed to make this objection at trial, we will affirm absent plain error. United States v. Calverley, 37 F.3d 160, 162 (5th Cir. 1994) (en banc), cert. denied, 115 S. Ct. 1266 (1995).

   Ismoila's position is without merit. The PSR and the Government's evidence at sentencing supported the four-level increase. Ismoila received the initial PSR, which recommended a two-level obstruction of justice enhancement based upon Ismoila's concealment of Eyikogbe, on May 7, 1993, almost six weeks before the date of sentencing. He had two opportunities to present objections to the PSR, in writing prior to the sentencing hearing and orally at the hearing itself. United States v. Mueller, 902 F.2d 336, 346 (5th Cir. 1990). On May 20, 1993--approximately four weeks before the sentencing hearing--the Government filed its objections to the PSR, in which it stated that it was prepared to prove at sentencing that Ismoila both harbored Eyikogbe and encouraged Eyikogbe and Oyewuwo to flee the Houston area and that it would seek a two-level upward departure. Furthermore, the Government stated that it had telephone records showing that Ismoila called home after his arrest. On May 24, 1993--over three weeks before sentencing--Ismoila's wife testified under oath that she told Ismoila that Eyikogbe was present at their house. The record thus shows that Ismoila had ample opportunity to present information to the court.

   Ismoila's claim that the court failed to issue findings of fact before the sentencing hearing as required by § 6A1.3(b) and Fed. R. Crim. P. 32 is similarly without merit. Rule 32 does require the court to resolved disputed issues of fact, but the sentencing court made sufficient findings to support its decision. Fed. R. Crim. P. 32(c)(3); Mueller, 902 F.2d at 346. Although the court did not issue these factual findings before sentencing, the PSR forms the factual basis for the sentencing decision. Mueller, 902 F.2d at 346.

35

sufficient because the court adopted the findings of the PSR, which expressly evaluated Ismoila's financial condition. United States v. Thomas, 13 F.3d 151, 153 (5th Cir. 1994). The court ordered restitution in the amount of $111,008, the same figure recommended by the PSR.

Second, as a participant in a conspiracy, Ismoila "is legally liable for all the actions of her co-conspirators in furtherance of this crime." United States v. Chaney, 964 F.2d 437, 453 (5th Cir. 1992). The district court was therefore well within its discretion to order restitution for the losses resulting from the entire fraudulent scheme and not merely the losses directly attributable to Ismoila's actions. Id.; United States v. All Star Industries, 962 F.2d 465, 478 (5th Cir.), cert. denied, 113 S. Ct. 377 (1992).

## V. THE JURY CHARGE

The district court charged the jury that they must find that Ismoila "knowingly created a scheme to defraud." Ismoila asserts that this instruction omitted an essential element of wire fraud by using the word "knowingly" instead of "willfully." We disagree.

Ismoila relies on United States v. Mekjian, 505 F.2d 1320, 1324 (5th Cir. 1975), a case in which this Court reversed a conviction on the ground that the word "willfully" was omitted from the indictment and that the word "knowingly" was not an adequate substitute. Id. However, the statute at issue in Mekjian was 18 U.S.C. § 1001, which by its terms requires a mens rea of both "knowingly" and "willfully." Id. at 1322 n.1. The wire fraud statute, 18 U.S.C. § 1343, does not specifically mention an intent

36

element, but this Court has held that the "requisite intent to defraud under § 1343 exists if the defendant acts 'knowingly and with the specific intent to deceive.'" <u>United States v. Keller</u>, 14 F.3d 1051, 1056 (5th Cir. 1994) (<u>quoting</u> <u>United States v. St. Gelais</u>, 952 F.2d 90, 96 (5th Cir.), <u>cert.</u> <u>denied</u>, 113 S. Ct. 439 (1992)).  In this case, the district court instructed the jury that it must find that the defendant acted "knowingly . . . with a specific intent to commit fraud," a charge that is nearly identical to that set forth in <u>Keller</u>.  The jury instruction was therefore entirely proper.

## VI.  THE REMAINING ISSUES

Ismoila also raises the following issues:  (1) that the district court erred by admitting into evidence the testimony of Roxanne Sebring, the FBI financial analyst who summarized the bank account evidence; (2) that the statements made by the prosecutor in the Government's closing argument undermined his right to a fair trial; (3) that the district court erred by failing to give a specific unanimity instruction regarding the conspiracy count; (4) that the $2,800 seized from him upon his arrest be returned to him; (5) that his alien registration card be returned to him; and (6) that his restitution obligation be stayed.

We do not discuss these issues because they are wholly without merit.

AFFIRMED IN PART, REVERSED AND VACATED IN PART, and RENDERED.