# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 16, 2013

No. 11-30908

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

MICHAEL ROUSSEL,

Defendant-Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, JONES, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

Michael Roussel ("Roussel") appeals his conviction along with the sentence imposed. For the reasons articulated below, we AFFIRM the conviction, VACATE the sentence, and REMAND for resentencing.

## FACTS AND PROCEEDINGS

*I. Procedural History*

Roussel, a New Orleans Police Department ("NOPD") Captain and Traffic Division commander, and Joey Branch ("Branch"), a Texas businessman, were indicted on five counts of wire fraud and one count of conspiracy involving a scheme to defraud Entergy Services, Inc. ("Entergy"), a New Orleans-based utilities provider. Branch pleaded to conspiracy, entered into a plea agreement

No. 11-30908

whereby he agreed to the statutory maximum five-year sentence, and cooperated with the government.

Roussel proceeded to trial. At trial, the district court read to the jury the Fifth Circuit Pattern Jury Instruction's "deliberate ignorance"[1] charge, which relates to the *mens rea* required for conviction. The district court also read to the jury a modified version of the circuit's pattern jury instruction regarding limitations for consideration of "other acts" under Federal Rule of Evidence 404(b). The district court allowed Roussel's attorney to cross-examine Branch about his sentencing reduction in exchange for cooperating with the government, but limited detailed inquiry into the magnitude of the benefit Branch received. The jury returned a partial verdict, convicting Roussel of conspiracy and two wire fraud counts, acquitting him on one wire fraud count, and remaining undecided on the remaining two wire fraud counts.

On September 8, 2011, the district court sentenced Roussel. The court, in determining the advisory range under the United States Sentencing Guidelines ("sentencing guidelines") § 2C1.1, found that Roussel was a public official and a high-level public official, that more than one bribe was anticipated, and that the reasonably expected benefits from the fraudulent scheme were between $1,000,000.01 and $2,500,000.00. This resulted in an offense level of 38 and a sentencing guidelines range of 235-293 months, equivalent to the base offense level for second degree murder. U.S. Sentencing Guidelines Manual § 2A1.2. The district court, however, determined that the "guidelines themselves came to an unreasonable result," granted a downward variance, and imposed a 136-month sentence—99 months below the bottom of the advisory range. Roussel timely appealed, asserting that the district court committed numerous errors during trial and at sentencing.

---

[1] This is also known as the "willful blindness" charge.

2

No. 11-30908

*II. Facts*

The conspiracy to defraud Entergy centered around a bribery plan of Roussel and Branch, along with Louis Dabdoub ("Dabdoub"), the Entergy security manager who assisted the FBI in the investigation. Roussel, as the NOPD Traffic Division commander, helped coordinate traffic for hurricane evacuations. Branch owned Gladius Inc. ("Gladius"), a Texas company that provided security guards to other companies. Dabdoub, a retired NOPD Captain, was Entergy's security manager. He assisted with hiring security guards for Entergy for natural disasters, including hurricanes.

In 2008, Branch, through Gladius, provided armed security guards to Home Depot in New Orleans following Hurricane Gustav. NOPD officers complained that Gladius's guards did not have proper certifications. A friend put Branch in touch with Roussel, who assisted in solving the problem. Roussel later assisted Branch with other paid details.

On June 10, 2010, Branch visited New Orleans and asked Roussel if he knew any big companies willing to work with Gladius. Branch told Roussel that he paid "finder's fees" to assist Gladius in obtaining contracts. Roussel told Branch he knew Dabdoub, Entergy's security manager. Branch asked if Dabdoub was a decision-maker, and Roussel allegedly responded, "Yes, but he's going to want a piece of it." Roussel later denied making this statement in testimony. Roussel then called Dabdoub himself to explain Branch's operation. During the call, he allegedly told Dabdoub, "man, have I got some money for you." Roussel later testified that he was simply repeating to Dabdoub what Branch had told him.

Dabdoub became suspicious of the plan. In fact, as Roussel's NOPD commander in 1997, Dabdoub had accused Roussel of tipping off a drug dealer

3

about an impending raid and then lying about his whereabouts.[2] Ultimately, the accusation that Roussel had obstructed justice by tipping off the drug dealer was not sustained, though the accusation that he lied about his whereabouts was sustained. He was therefore suspended without pay for three days. According to Roussel, this was the only blemish on his record.

After Roussel's call about the Gladius proposal, Dabdoub called NOPD Major James Treadaway. Treadaway passed on the information to the NOPD Superintendent, who called the FBI. Dabdoub assisted by acting as a corrupt security manager for Entergy. Dabdoub placed a recorded call to Roussel on June 14, 2010, agreeing to meet Branch. On the call, Roussel said, "[T]here is some money for us."

Branch flew his plane to New Orleans Lakefront Airport later that day. Roussel, in his NOPD uniform and driving an NOPD vehicle reserved for dignitaries, drove Branch and his associates to Entergy. At the video recorded meeting, Branch and Dabdoub discussed the deal, while Roussel, sitting in the back, listened, texted, and occasionally commented when the conversation was directed to him. He left to use the bathroom when discussions turned to paying Dabdoub, and returned about a minute-and-a-half later. While he was out,

---

[2] In that incident, a narcotics officer received a call from an informant stating where a known drug dealer could be found. When police arrived to apprehend the suspect, the suspect possessed no drugs. However, he had a pager, which had received a page from the NOPD Sixth District station's main number at the same time as or just after the informant's call was placed to the officer. Though Roussel was not on the narcotics squad, he later arrived at the scene in his personal car and spoke briefly to the suspect.

The NOPD's Public Integrity Bureau had conducted an investigation into the 1997 matter. The two officers involved in the telephone conversation with the informant stated that they saw only Roussel come in and out of the room while the phone conversation was occurring. As part of the investigation, Dabdoub questioned Roussel about his whereabouts at the time of the informant's call. Roussel denied being at the Sixth District station on the day of the call, although Dabdoub remembered seeing him earlier that day at the station. Later, Roussel told investigators that he never spoke with Dabdoub about his whereabouts on the day of the raid.

No. 11-30908

Dabdoub and Branch decided Dabdoub's wife would become employed by Gladius. Roussel was told about this arrangement when he returned.

Again in Roussel's presence, Dabdoub and Branch arranged for Entergy to pay Gladius $89.50 per guard per hour, which was inflated about $15 over what Gladius needed to make a profit. Branch and Dabdoub discussed dividing the excess $15, agreeing, after Branch stated, "I have to have my consultant here," that they and Roussel would split it three ways. Roussel testified at trial that he was "bored" during the meeting, that the talk was above him, and that he "didn't give it any thought" that the men could be scheming to defraud Entergy.

Afterwards, Roussel and Branch had dinner in the French Quarter and, according to Branch, talked about early retirement from all the money they would make. On June 16, 2010, Dabdoub placed a recorded call to Roussel to request "good faith" money from Branch, to ensure that Branch would not deceive them. Roussel said he would call Branch later that day, but the parties dispute whether or not he ever made the call. On June 20, 2010, Branch called Roussel and Roussel told him about Dabdoub's request for "good faith" money. This upset Branch. Roussel testified that he suggested Branch take Dabdoub out to dinner to show his "good faith." Branch testified that he told Roussel he would pay $10,000, but after Roussel said it was too much, Branch said he would pay $1,000.

On June 22, 2010, Branch flew back to New Orleans to execute the contract. Roussel, again in his NOPD uniform and driving an NOPD vehicle, drove Branch and his associates to Entergy. During the ride, Branch gave Roussel $500.[3] Immediately before the group meeting among Branch, Roussel, Dabdoub, and several Entergy and Gladius staff, the three met privately in

---

[3] Roussel testified that this was money owed to him for coordinating a prior detail, while Branch testified that this was his "good faith" money to Roussel for the Entergy deal.

No. 11-30908

Dabdoub's office. In Roussel's presence, Branch gave Dabdoub an envelope containing the $1,000 in "good faith" money. Branch also gave Dabdoub the paperwork for Gladius to hire Dabdoub's wife, and the two joked about Dabdoub's wife being "the best-paid secretary" ever. When Dabdoub began to discuss the amount of money the three could make from the deal, Roussel replied, rhetorically, "I don't even want to know." The three then returned to the group conference room and the parties signed the fraudulent contract.

Afterwards, agents arrested Branch and Roussel. When questioned, Roussel stated that the contract would never be carried out because Branch would not follow through.

## DISCUSSION

Roussel asserts that the district court committed three errors during trial and four errors during sentencing. Regarding the trial errors, he argues that the district court committed error in: (1) its issuance of this circuit's "deliberate ignorance" pattern jury instruction; (2) its Federal Rule of Evidence 404(b) instruction to the jury on "other acts;" and (3) limiting Roussel's counsel's cross-examination of Branch regarding Branch's plea agreement, which denied Roussel his constitutional right to confront his accuser.

With respect to sentencing, Roussel asserts that the sentencing guidelines enhancements were improper because the district court clearly erred in: (1) finding that Roussel was a public official and a high-level public official; (2) finding that more than one bribe occurred; and (3) its calculation of the expected monetary benefit from the fraudulent contract. Additionally, Roussel contends the district court violated the Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in considering a 30-year statutory maximum sentence when the evidence presented to the jury was only sufficient to convict on a crime with a 20-year maximum. We address each of these claims in order.

6

*I.  Whether the district court's issuance of this circuit's "deliberate ignorance" pattern jury instruction was, even if erroneous and in violation of Supreme Court precedent, harmless error.*

*A.  Standard of Review*

The parties dispute the applicable standard of review.  The government argues that Roussel did not "inform the court of the specific objection [to the jury instruction] and the grounds for the objection," which requires a review of the district court's decision to issue the jury instruction and the content of the instruction for plain error.  Fed. R. Crim. P. 30(d).  Roussel argues that he properly objected, and that we "review preserved error in jury instructions under an abuse of discretion standard and ask whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them."  *United States v. Brooks*, 681 F.3d 678, 697 (5th Cir. 2012) (quotation omitted).  Nonetheless, "[a]ny error is subject to harmless error review," *United States v. Mendoza-Medina*, 346 F.3d 121, 132 (5th Cir. 2003) (citation omitted), rendering moot the parties' disagreement regarding the applicable standard of review.

*B.  Analysis*

Though the deliberate ignorance instruction was improper, the district court's error was harmless.

Roussel argues that the district court's decision to give the instruction was improper because it lowered the required *mens rea*, and that the circuit's pattern instruction is in violation of Supreme Court precedent.  The government argues that both the court's decision to give the instruction and the language of the instruction were proper.

This circuit's pattern jury instructions state that " 'knowingly' . . . means that the act was done voluntarily and intentionally, not because of mistake or accident."  5th Cir. Pattern Jury Instructions: Criminal § 1.37 (2001).  If a

No. 11-30908

deliberate ignorance instruction is warranted, the judge may continue reading from the pattern instruction as follows:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

*Id.*

"[A] deliberate ignorance instruction is warranted when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." *Brooks,* 681 F.3d at 701 (quotation omitted). "The evidence at trial must raise two inferences: (1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *Id.* (quotation omitted).

In *Mendoza-Medina,* we explained:

> We have often cautioned against the use of the deliberate ignorance instruction. Because the instruction permits a jury to convict a defendant without a finding that the defendant was actually aware of the existence of illegal conduct, the deliberate ignorance instruction poses the risk that a jury might convict the defendant on a lesser negligence standard—the defendant *should* have been aware of the illegal conduct.

*Mendoza-Medina*, 346 F.3d at 132 (quotation omitted).

Last year, we further elaborated that "[d]eliberate indifference instructions are inappropriate in the usual case, where the evidence presents a simple choice between a version of the facts in which the defendant had actual knowledge, and one in which the defendant was no more than negligent or stupid." *United States v. Jones*, 664 F.3d 966, 979 (5th Cir. 2011) (quotation omitted), *cert. denied*, 132 S. Ct. 2728 (2012).

8

No. 11-30908

Nevertheless, we have "consistently held that an error in giving the deliberate ignorance instruction is . . . harmless where there is substantial evidence of actual knowledge." *United States v. Threadgill*, 172 F.3d 357, 369 (5th Cir. 1999) (quotations omitted); *accord Jones*, 664 F.3d at 979 (holding that any erroneous issuance of deliberate ignorance jury charge was harmless in that case). In *Threadgill*, we found that the defendants had actual knowledge of their participation in a money laundering scheme, and there was thus no need to address whether the deliberate ignorance instruction was properly submitted. *Id.* "We concede, after reviewing the record, that there is little evidence that the defendants purposefully contrived to avoid knowing that their actions were unlawful. In fact, the evidence reveals just the opposite, that the defendants knew that their conduct was criminal and took elaborate measures to hide it." *Id.*

Here, the district court's issuance of the deliberate ignorance charge, though erroneous, was harmless error. As in *Threadgill*, there was substantial evidence of Roussel's actual knowledge of the illegal scheme. The record reflects that, to the extent he attempted to take any exculpatory actions, they had the purpose of hiding his involvement in the fraud, not to avoid knowledge of it altogether. Roussel was an essential player in the three-way scheme from the beginning. He connected Branch and Dabdoub, facilitated and participated in meetings and telephone calls, shuttled Branch back and forth to those meetings, stayed involved throughout the negotiations of the fraudulent contract, assented to receiving a portion of the kickback, and advised Branch on the amount of "good faith" money that Branch would pay Dabdoub. He also admitted to having at least some knowledge of Branch's untruthful ways when questioned after his arrest, calling Branch a "bullshit artist."

During the sentencing proceedings, the district court elaborated on the overwhelming evidence against Roussel:

No. 11-30908

>The whole crime, basically, was committed on videotape, and I watched Mr. Roussel, not only listened to his words but watched his body language, his facial expressions, his conduct on the videotapes.

>Although, it is true, he sort of sat back and let Mr. Branch and Mr. Dabdoub do most of the talking, there is no doubt in my mind that he was clearly involved, very involved in what they were discussing, very aware of what they were discussing, and his testimony that he didn't understand, was not aware that they were talking about something that was illegal just, frankly, was preposterous to me.

To the extent Roussel contends that he was merely a "consultant" and his only interest was to receive a "finder's fee," he remained intimately involved in the transaction for a much longer period of time than was necessary or reasonable to maintain such an innocent role.

Whether Roussel was bored and texting during the June 14, 2010 meeting at Entergy is not dispositive of his knowledge of, or involvement in, the scheme. Nor is Roussel's leaving to use the bathroom "almost immediately when discussions turned to paying Dabdoub," Gov't App. Br. at 8, proof of Roussel's lack of knowledge (as he claims) or proof that he was acting to deliberately avoid knowledge of the kickback scheme (as the government claims). He was told upon his return that Branch would hire Dabdoub's wife and that they would split the $15 overpayment three ways. That is substantial knowledge of the illegal scheme. Therefore, the district court's issuance of the deliberate ignorance instruction was erroneous, but the error was harmless.

Since we find harmless error, there is no need to address Roussel's argument that this circuit's pattern deliberate ignorance instruction is improper in light of *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011). Nonetheless, we have already expressly approved continued use of the pattern

No. 11-30908

instruction post-*Global-Tech.*[4]  *United States v. Brooks*, 681 F.3d 678, 702-03 (5th Cir. 2012) ("although this [Fifth Circuit pattern deliberate ignorance] instruction obviously does not use the same language as *Global-Tech*, the same meaning is conveyed.").  Therefore, Roussel's argument is without merit.

*II.  Whether the district court erred in its Rule 404(b) instruction to the jury on "other acts."*

> Rule 404(b) reads:
>
> (1) Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> (2) This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  On request by a defendant in a criminal case, the prosecutor must:
>> (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
>> (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b).

The evidence at issue here was Dabdoub's 1997 accusation that Roussel tipped off drug dealers about an impending raid and then lied about his whereabouts to cover it up.  The NOPD's Public Integrity Bureau did not sustain the accusation against Roussel for tipping off the drug dealer, but it did sustain the accusation of "untruthfulness" for lying to Dabdoub about his whereabouts that day.

What makes this case different from the typical Rule 404(b) dispute is that, here, the *defense* sought to introduce evidence of other acts.  During trial, the district court stated that "the government originally offered [evidence of the

---

[4]  In *Global-Tech*, the Supreme Court considered deliberate ignorance in the civil context, stating that deliberate ignorance requires proof that: (1) the defendant subjectively believed that there was a high probability that a fact exists and (2) the defendant took deliberate actions to avoid learning of that fact.  *Global-Tech*, 131 S. Ct. at 2070 (citations omitted).

11

1997 NOPD incident] as a 404(b) evidence, and . . . I was inclined to keep it out of this case completely until the defense injected it into the case for other reasons." Roussel "marshaled this evidence in support of its theory that Roussel would not have knowingly approached Dabdoub, his dogged prior accuser, with a solicitation for illegal activity." Roussel App. Br. at 22. Therefore, as the district court correctly recognized, the standard Rule 404(b) jury instruction would need to be modified to account for the atypical situation and to ensure that the evidence of the 1997 incident would not be used to prove Roussel had a propensity to commit the crimes in the indictment.

To the extent the introduction of the evidence was erroneous, the doctrine of invited error applies to this situation; when injection of inadmissible evidence is attributable to the actions of the defense, the defense cannot later object to such "invited error." *United States v. Raymer*, 876 F.2d 383, 388 (5th Cir. 1989) (citing, e.g., *United States v. Lemaire*, 712 F.2d 944, 948-49 (5th Cir. 1983), *cert. denied*, 464 U.S. 1012 (1983)), *cert. denied* 110 S. Ct. 198 (1989). Roussel invited any erroneous Rule 404(b) instruction by injecting the evidence of the 1997 incident into the case. Now that he has lost this risky bet, he attempts to demonstrate that the district court's instruction was improper all along. On appeal, he asserts a new and inapplicable argument that "[t]he other acts—unsubstantiated, fourteen-year-old misconduct allegations against Mr. Roussel—were dissimilar from the charged offense, were remote in time, and had no proper bearing on Mr. Roussel's guilt for the charged offense." Roussel Reply Br. at 23. Indeed, it appears that he is now making a typical 404(b) argument that the evidence should never have been introduced in the first place. Given that he requested the introduction of the evidence, however, he invited any error in the issuance of the instruction.[5]

---

[5] The government contends that Roussel's ultimate assent to the Rule 404(b) instruction constitutes a waiver, citing *United States v. Jefferson*, 432 F. App'x 382, 387-88 (5th Cir. 2011)

No. 11-30908

*III.   Whether the district court erred in limiting Roussel's counsel's cross-examination of Branch regarding Branch's plea agreement, and, if so, whether that error violated Roussel's right to confront his accuser.*

### A. Standard of Review

A constitutional question merits *de novo* review. *See United States v. Asibor*, 109 F.3d 1023, 1037 (5th Cir. 1997). Once the Confrontation Clause of the Sixth Amendment has been satisfied, limitation of cross-examination is reviewed for abuse of discretion. *United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004).[6]

### B. Analysis

Reviewing the constitutional question *de novo*, there was no violation of Roussel's Sixth Amendment right to confront his accuser. Beyond that, reviewing the limitation of Roussel's counsel's cross-examination of Branch for any other impropriety, the district court did not abuse its discretion.[7]

Roussel argues that his Sixth Amendment right to confront his accuser was violated and that the district court's limitation on his counsel's cross-examination of Branch about Branch's actual exposure under the guidelines was otherwise improper. "While the scope of cross-examination is within the discretion of the trial judge, this discretionary authority comes into play only after there has been permitted as a matter of right sufficient cross-examination

---

("The defense counsel's agreement to the instructions constitutes a waiver.")). We need not consider this argument, however, since Roussel invited any error in the district court's instruction.

[6] Again, Roussel and the government disagree on the applicable standard of review. The government asserts that Roussel did not preserve his objection, and that review is therefore limited to plain error. We need not address this disagreement because, even assuming Roussel preserved his objection, as explained below, the district court did not err in limiting the cross-examination.

[7] After Roussel's counsel repeatedly questioned Branch about the sentencing guidelines' effect on the magnitude of his benefit, the district court stated "[w]e've beat this horse to death, Mr. Reed. We really have. We're not going into sentencing guidelines."

13

to satisfy the Sixth Amendment." *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993). The Sixth Amendment's Confrontation Clause is violated if "the defendant [can] show that a reasonable jury might have had a significantly different impression of the witness's credibility if defense counsel had been allowed to pursue the questioning." *Davis*, 393 F.3d at 548.

In *Davis*, we ruled that there was no Sixth Amendment violation or abuse of discretion regarding the court's limitation on cross-examination because defense counsel was able to elicit information on the effect of a plea agreement on the dismissal of the indictment against the witness. *Davis*, 393 F.3d at 547-48. Additionally, in *Restivo*, we held that there was no Sixth Amendment violation or abuse of discretion regarding the court's limitation on cross-examination because defense counsel had elicited sufficient testimony to infer the witness's bias. *Restivo*, 8 F.3d at 278.

Roussel argues that his counsel was unable to question Branch about Branch's actual exposure under the guidelines or further benefits that Branch may receive through his cooperation. Nevertheless, the jury had more than enough information to infer Branch's potential bias in testifying against Roussel, including Branch's maximum statutory penalty on the initial charges (30 years), the government's agreement to prosecute Branch on only one of the six charges and Branch's agreement to plead guilty on that charge, and the resulting statutory cap on Branch's sentence (five years). Additionally, the jury had a copy of Branch's full plea agreement. Beyond that, the jury knew that the government could ask for an even lesser sentence depending on the value of Branch's cooperation.

This was more than sufficient to satisfy the Confrontation Clause, and does not indicate that the district court abused its discretion by limiting questioning into Branch's possible exposure under the sentencing guidelines. Given that he had not yet been sentenced at the time of his testimony, Branch's

own estimate of his sentence under the sentencing guidelines[8] would have been speculative and confusing to the jury.

That the jury knew about a possible 25-year sentencing reduction and Branch's plea to only one of six counts in exchange for his cooperation was more than enough information to infer Branch's bias as a witness, and, therefore, there was no Confrontation Clause violation nor abuse of discretion in limiting Roussel's counsel's cross-examination.

*IV. Whether the district court clearly erred in finding Roussel was a public official and a high-level public official for the purposes of the sentencing guidelines enhancements.*

### A. Standard of Review

We review purely legal conclusions or interpretations of the meaning of a sentencing guideline *de novo*, and review the trial court's findings of fact for clear error. *United States v. Mann*, 493 F.3d 484, 492 (5th Cir. 2007). Clear error exists if we are left with a definite and firm conviction that a mistake has been made. *United States v. Griffin*, 324 F.3d 330, 365 (5th Cir. 2003). We may affirm the district court's judgment on any basis supported by the record. *United States v. Le*, 512 F.3d 128, 134 (5th Cir. 2007) (quotation omitted).

### B. Analysis

The district court did not err in applying sentencing enhancements based on its findings that Roussel was a public official, and a high-level public official or a public official in a sensitive position.

Section 2C1.1(a) of the sentencing guidelines requires a base offense level of 14 "if the defendant was a public official." Otherwise, the base offense level is 12. *Id.* The commentary to the section, in relevant part, defines "public official" as:

---

[8] In any case, the sentencing guidelines are advisory only. *United States v. Booker*, 543 U.S. 220, 246, 259-60 (2005).

(C)  An officer or employee or person acting for or on behalf of a state or local government, or any department, agency, or branch of government thereof, in any function, under or by authority of such department, agency, or branch of government, or a juror in a state or local trial.

* * *

(E)  An individual who, although not otherwise covered by subdivisions (A) through (D): (i) is in a position of public trust with official responsibility for carrying out a government program or policy; (ii) acts under color of law or official right; or (iii) participates so substantially in government operations as to possess de facto authority to make governmental decisions . . . .

U.S. Sentencing Guidelines Manual § 2C1.1 cmt. n.1.[9]

Additionally, § 2C1.1(b)(3) requires that "[i]f the offense involved an elected public official or any public official in a high-level decision-making or sensitive position, increase by 4 levels."  The commentary to the section defines a "high-level decision-making or sensitive position" as "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process."  U.S. Sentencing Guidelines Manual § 2C1.1 cmt. n.4.  It provides examples of a public official in a high-level decision-making position, "includ[ing] a prosecuting attorney, a judge, an agency administrator, and any other public official with a similar level of authority."  *Id.*  "Examples of a public official who holds a sensitive position include a juror, *a law enforcement officer*, an election official, and any other similarly situated individual."  *Id.* (emphasis added).

Roussel argues that the district court erred in applying the § 2C1.1(a) "public official" enhancement because he was not "acting for or on behalf of" the

---

[9] "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  *Stinson v. United States*, 508 U.S. 36, 38 (1993).

NOPD at the specific times he engaged in the criminal activity. He further argues that his wearing his Captain's uniform and use of his police vehicle while off duty to chauffeur Branch were not indicative of his acting in an official capacity, and that "his position provided him with no special access to Dabdoub, who was an acquaintance from high school and no longer employed by the NOPD." Roussel App. Br. at 32-33. Despite this, the district court found that he was acting in his official capacity or under the authority of his office at the time the crimes were committed.

Irrespective of whether Roussel was acting for the NOPD at the time of the criminal activity, he was "in a position of public trust with official responsibility for carrying out a government program or policy," U.S. Sentencing Guidelines Manual § 2C1.1 cmt. n.1(E), and was therefore a "public official" for the purposes of the sentencing guidelines. He was the commander of the NOPD's Traffic Division, responsible for the incredibly important job of coordinating hurricane evacuations. This was clearly a position of public trust. Therefore, as we may affirm a district court's decision on any basis supported by the record, *Le*, 512 F.3d at 134, the "public official" sentencing enhancement was not clearly erroneous.

The four-level sentencing enhancement based on Roussel's high-level or sensitive position was also appropriate. The commentary to § 2C1.1(b)(3) explicitly identifies a police officer as a person holding a sensitive position. U.S. Sentencing Guidelines Manual § 2C1.1 cmt. n.4(B). Additionally, as a Captain in the NOPD, Roussel was clearly in a high-level position.

Roussel argues that the four-point "high-level or sensitive position" sentencing enhancement was improper because he "was not the subject of the bribe and his official role was not compromised." Roussel App. Br. at 36 (citing *United States v. Barraza*, 655 F.3d 375, 384 (5th Cir. 2011) ("The commentary explains that the four-level enhancement should be applied 'if the payment was

for the purpose of influencing an official act by certain officials.'") (quoting U.S. Sentencing Guidelines Manual § 2C1.1 cmt. background) (erroneously attributed to U.S. Sentencing Guidelines Manual § 1B1.1 cmt. background)*, cert. denied*, 132 S. Ct. 1590 (2012)).    Roussel deduces from this that the four-level enhancement is precluded in any other situation.

In 2004, the sentencing guidelines were amended by removing language requiring an eight-level enhancement where "the offense involved a payment for the purpose of influencing an elected official or any official holding a high-level decision-making or sensitive position." *See* U.S. Sentencing Guidelines Manual app. C, amend. 666.12.  Following Amendment 666, this language is no longer part of the guidelines, though it remains as an instructive example in the background to the commentary.[10]  Instead, § 2C1.1(b)(3) was implemented to apply a four-level increase when "the offense involves an elected public official or any public official in a high-level decision-making or sensitive position."  The amendment demonstrates an intention to expand the reach of the four-level enhancement beyond public officials that receive direct payment bribes to influence their official actions.

Furthermore, Roussel's reliance on *Barraza* and other cases is unpersuasive, as the courts there were merely applying the sentencing enhancement based on the particular facts of those cases.  This does not in any way suggest that the "high-level or sensitive position" enhancement is improper in any other situations.[11]

---

[10] As the district court stated during the sentencing proceedings, the background is "illustrative of examples of what they mean, but it doesn't say that's the only way this could fit.  It says, '[i]t applies to a person who offers or gives a bribe for a corrupt purpose,' which certainly applies here."

[11] "[A] guideline for the offense must be designed to cover diverse situations."  U.S. Sentencing Guidelines Manual § 2C1.1 cmt. background.

No. 11-30908

Though he states early in his opening brief that he will not argue this, Roussel also asserts in his reply brief that Roussel should not receive the four-level sentencing guidelines enhancement because Branch did not.  He posits that, since the guidelines require a four-level enhancement for crimes "involving" a high-level or sensitive position, Branch should have also received the enhancement.  Roussel Reply Br. at 4.  Branch's lesser sentence, however, does not assist Roussel because "a mere disparity of sentences among co-defendants does not, alone, constitute an abuse of discretion." *United States v. Ochoa*, 667 F.3d 643, 651 (5th Cir. 2012) (finding no abuse of discretion for sentencing one defendant to 235 months and government cooperator to three years).  In any case, Roussel may have been more deserving of the enhancement because "offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them . . . ."  U.S. Sentencing Guidelines Manual app. C, amend. 666, reason for amendment.

For all the reasons stated above, the district court did not clearly err in applying either the "public official" sentencing guidelines enhancement or the "high-level or sensitive position" enhancement to Roussel.

*V. Whether the district court clearly erred in finding that more than one bribe occurred, meriting a sentencing guidelines enhancement.*

*A. Standard of Review*

Again, we review purely legal conclusions or interpretations of the meaning of a sentencing guideline *de novo*, and review the trial court's findings of fact—including the relevant conduct for determining whether more than one bribe occurred—for clear error. *See United States v. Mann*, 493 F.3d 484, 492 (5th Cir. 2007) (citation omitted) (determining there was no clear error in district court's finding more than one act of extortion); *United States v. Griffin*, 324 F.3d 330, 365 (5th Cir. 2003) (citation and internal quotation marks omitted) (holding that district court clearly erred in finding more than one bribe).  Clear error

No. 11-30908

exists if we are left with a definite and firm conviction that a mistake has been made. *Griffin*, 324 F.3d at 365 (citation omitted).

*B. Analysis*

The district court clearly erred in finding that more than one bribe occurred, and the two-level enhancement under § 2C1.1(b)(1) of the sentencing guidelines was therefore improper. The guidelines' commentary states that

> [s]ubsection (b)(1) provides an adjustment for offenses involving more than one incident of either bribery or extortion. Related payments that, in essence, constitute a single incident of bribery or extortion (e.g., a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts.

U.S. Sentencing Guidelines Manual § 2C1.1 cmt. n.2.

"The 'offense' referred to in section 2C1.1(b)(1) includes 'the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context.'" *Mann*, 493 F.3d at 497 (5th Cir. 2007) (quoting U.S. Sentencing Guidelines Manual § 1B1.1 cmt. n.1) (affirming district court's application of two-level sentencing guidelines enhancement based on the commission of more than one act of extortion).[12] "Relevant conduct includes offenses that are part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.*

---

[12] § 1B1.3 defines, in material part, the "relevant conduct" to be considered in determining the guidelines range as follows:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S. Sentencing Guidelines Manual § 1B1.3(a)(1).

(quotation omitted). "A district court's determination of what constitutes relevant conduct is reviewed for clear error." *Id*.

During the sentencing proceedings, the district court found that:

> [w]hat was intended was a series of actions over a period of time. This contract was to continue for some period of time in the future . . . . It could not be anticipated exactly when they would occur, but whenever there would be a presidentially declared natural catastrophe or emergency and Entergy would be required to immediately beef up its security force, then . . . Gladius, would be called upon to supply security officers, . . . but in any event, it seems to me that that is very different from a one-time agreement to pay a bribe that is then just paid over in installments. This was going to be a series of actions. Effectively another bribe to be paid every time there was another event that occurred.

Roussel requests that we adopt the Second Circuit's test for determining whether more than one bribe took place. In *United States v. Arshad*, 239 F.3d 276, 280-82 (2d Cir. 2001), the Second Circuit announced three factors to determine whether multiple bribes occurred for the purposes of the two-level sentencing guidelines enhancement: (1) whether the payments were made to influence a "single action;" (2) whether the pattern and amount of payments bear the hallmarks of installment payments, such as a regular schedule of payments over a finite period of time toward a fixed final sum, rather than a series of intermittent and varied bribes; and (3) whether the method for making each payment remains the same. *Arshad*, 239 F.3d at 280-82. At least one other circuit has applied the *Arshad* factors to find that multiple bribes took place. *See United States v. Weaver*, 175 F. App'x 506, 509-11 (3d Cir. 2006).

Roussel, applying the *Arshad* factors, asserts that the bribe intended for Louis Dabdoub was: (1) to influence a single action, the confection of the fraudulent Entergy contract; (2) for a fixed amount of the fraudulent Entergy contract with Gladius ($4.83 out of every $89.50, or approximately 5% of all future security needs), a hallmark of installment payments; and (3) to be

No. 11-30908

consistently paid to Dabdoub's wife as compensation for her sham employment with Gladius. Roussel Reply Br. at 9. Roussel also argues the consistently immaterial point that, since Branch did not receive the enhancement, Roussel should not have either.

We need not address the *Arshad* factors to come to the conclusion that Roussel was not involved with the payment of more than one bribe. Simply put, the government proved the payment of only one bribe—the $1,000 "good faith" money to Dabdoub. The rest was all speculative. The defendant in *Arshad*, a contractor who bribed a state building inspector for overlooking defective work, paid the inspector at least four separate times. *Arshad*, 239 F.3d at 278. The defendant in *Weaver*, a public school employee who received kickbacks under a contract for laptop computers, received thirteen different bribe payments. *Weaver*, 175 F. App'x at 510. § 1B1.3(a)(1) of the sentencing guidelines lists all "relevant conduct" in the past tense. The government does not cite a single case where unknown possible future payments were included in determining whether more than one bribe occurred. Moreover, the district court seemed to improperly characterize the contract as having an indefinite duration with an indefinite number of future bribe payments; in fact, it was only a one-year contract, lasting from June 16, 2010 until June 15, 2011. It is indeed illustrative to note that, as a result of the speculative nature of the payments, the United States Probation Office recommended a sentence for Roussel of 96 months—40 months below the sentence imposed. *See* Sentencing Recommendation, 1-2. In sum, we are firmly convinced that the district court erred in finding more than one bribe, and it should have therefore declined to apply the corresponding two-level sentencing guidelines enhancement.

*VI. Whether the district court clearly erred in its expected benefit calculation.*

   *A. Standard of Review*

No. 11-30908

Again, we review purely legal conclusions or interpretations of the meaning of a sentencing guideline *de novo*, and review the trial court's findings of fact—including benefit calculations—for clear error. *See Griffin*, 324 F.3d at 365 (holding that district court clearly erred in its benefit calculation for the purposes of the sentencing guidelines enhancement). Clear error exists if we are left with a definite and firm conviction that a mistake has been made. *Id*.

*B. Analysis*

For virtually the same reasons articulated with respect to the multiple bribes enhancement, we find that the district court clearly erred in its calculation of the fraudulent contract's expected benefit to Roussel, Branch, and Dabdoub.

The sentencing guidelines state:

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $5,000, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

U.S. Sentencing Guidelines Manual § 2C1.1(b)(2). The guidelines require a 12-level increase for expected benefits to Roussel, Branch, and Dabdoub between $200,000.01 and $400,000.00, and a 16-level increase for expected benefits between $1,000,000.01 and $2,500,000.00. U.S. Sentencing Guidelines Manual § 2B1.1(b)(1).

"[T]he loss need not be determined with precision. The court need only make a *reasonable* estimate of the loss, given the available information. Further, . . . *if an intended loss that the defendant was attempting to inflict can be determined*, this figure will be used if it is greater than the actual loss." *United States v. Ismoila*, 100 F.3d 380, 396 (5th Cir. 1996) (emphasis added) (quotation omitted) (holding that the intended loss was greater than the actual

loss, and therefore the district court's sentencing determination based on the intended loss was correct); *see also United States v. Chappell*, 6 F.3d 1095, 1101 (5th Cir.1993) (quotation omitted).[13]

The district court applied a 16-level enhancement based on the presentence investigation report's recommendation of estimated benefits to Branch, Roussel, and Dabdoub from the fraudulent overpayment of between $1,000,000.01 and $2,500,000.00. The enhancement was based on Entergy's payments during the 2008 hurricane season, which included Hurricanes Ike and Gustav, two abnormally costly storms.

Roussel first contends that the district court erred because there was no actual benefit, as the entire deal was fraudulent. Nonetheless, recognizing that the guidelines also require contemplation of benefits *to be received*, Roussel argues that to calculate the expected benefits, the district court should have used Entergy's actual applicable security needs for the one year the fraudulent contract was supposed to be in place, from June 16, 2010 until June 15, 2011. Based on that year, which had no hurricanes and only one incident in the form of the Mississippi floods, the benefit to Roussel, Branch, and Dabdoub would have only been $231,570.00. This would have only merited a 12-level enhancement, a four-level difference from the level applied by the district court.

In applying the guidelines enhancement, the district court observed that

> there is a reasonable basis to conclude that from all of the evidence,
> not only the evidence of what Entergy had, in fact, spent in other
> similar events but also the testimony and the discussions among the
> participants themselves as to what they anticipated being able to
> receive from this scheme. They all talked about retiring in 2 or 3

---

[13] For our analysis in this case only, we use "benefit" interchangeably with "loss" because they are the same amount here; the sole distinction is whether the speaker is the object or subject of the bribe (i.e. Entergy's "loss" would have been Roussel/Branch/Dabdoub's "benefit"). In other cases, however, benefit and loss may not be the same amount.

years, one or two big storms which would allow them to retire comfortably; so, they were talking about substantial sums of money.

We find the district court clearly erred in its calculation of the expected benefit. It is true that recent hurricanes were discussed during negotiations, and Roussel and Branch considered those storms—and the costs associated with them—as exemplars of what was to come. *See United States v. John*, 597 F.3d 263, 279 (5th Cir. 2010) ("In ascertaining the intended loss, the district court must determine the defendant's actual intent."). Nonetheless, the district court's calculation of expected benefit was purely speculative. There was no *reasonable* estimate of the "intended loss that the defendant was attempting to inflict." *Ismoila*, 100 F.3d at 396.

This case is distinguished from our holding in *Griffin*, in which the district court was presented with a set of known amounts of profits from various land deals allegedly resulting from a bribery scheme, and simply erred by including certain amounts that it should not have included in calculating the expected benefit from the scheme. This case is also distinguished from our holding in *Ismoila*, in which we found that "[t]he intended loss consisted of credit card charges of $85,203 and $6,200 that were attempted at [two stores]—charges that the credit card companies declined to process." *Ismoila*, 100 F.3d at 396. Again, those were *known* amounts upon which the district court could concretely base its calculation. Here, on the other hand, the district court arbitrarily based its calculation on the previous hurricane season, which happened to be one of the costliest in United States history. That arbitrariness is reflected in the district court's justification for the larger enhancement because "they were talking about substantial sums of money." "Substantial sums," however, cannot constitute an estimate of an intended benefit for the purposes of the sentencing guidelines enhancement.

No. 11-30908

There was a more accurate and straightforward way to estimate the expected benefit. We agree with Roussel that the sounder method would have been to calculate the benefit that Roussel, Branch, and Dabdoub would have *actually* obtained during the contract's duration—$231,570.00. This method comports with the sentencing guidelines and our holdings in *Griffin* and *Ismoila*. Our conclusion is further supported by the United States Probation Office's sentencing recommendation, which suggested a downward variance to Roussel's sentence because of the "speculative nature of the potential gain" and the fact that "there was no actual loss in the instant offense." Sentencing Recommendation at 1-2. We are firmly convinced that the district court erred in its calculation of the expected benefit, and that the correct amount would have called for only a 12-level sentencing guidelines enhancement and not the 16-level enhancement imposed.

*VII. Whether the district court's consideration of a 30-year statutory maximum sentence constituted an* Apprendi *violation.*

### A. Standard of Review

"The applicability of *Apprendi* to this case is a question of law that we review *de novo*," subject to harmless error analysis. *United States v. Matthews*, 312 F.3d 652, 661, 665 (5th Cir. 2002).

### B. Analysis

The Supreme Court has held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Nevertheless, "the Supreme Court's decision in *Apprendi* does not effect [sic] [a defendant's] term of imprisonment [when] it does not exceed the statutory maximum authorized by the jury's findings." *United States v. Doggett*, 230 F.3d 160, 165 (5th Cir. 2000) (citing *United States v. Meshack*, 225 F.3d 556, 575-76

26

No. 11-30908

(5th Cir.2000)) (affirming sentence because it was not greater than statutory maximum for crimes charged to jury and proved beyond a reasonable doubt).

18 U.S.C. § 1343, pursuant to which Roussel was charged, provides a 20-year maximum sentence for wire fraud but increases the maximum sentence to 30 years where the "violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency . . . ."

Roussel contends that no evidence was presented at trial supporting the assertion that Entergy would receive federal funds to subsidize its future security needs, though he acknowledges that evidence at trial showed that Entergy received federal funds for Hurricane Katrina-related needs. He argues that, for the offense level of 38 that the district court imposed, the upper end of the sentencing guidelines range was 293 months—almost four-and-a-half years more than the correct 20-year statutory maximum. The government does not contest Roussel's assertion, but insists that any *Apprendi* error was harmless because Roussel's 136-month sentence was less than 20 years.

While the district court's consideration at sentencing of the 30-year statutory maximum instead of the 20-year maximum was improper, it was harmless because Roussel's proper offense level was 32, meriting a sentencing guidelines range of 121-151 months. The correct guidelines range is well below the 20-year statutory maximum for wire fraud not connected to a presidentially declared major disaster or emergency. *See Doggett*, 230 F.3d at 165.

*VIII.   Whether the district court's 99-month downward variance renders its sentencing guidelines errors harmless.*

The district court's granting of a 99-month downward variance from the lowest point of the applicable sentencing guidelines range because the "guidelines themselves came to an unreasonable result" does not render harmless the court's starting from an incorrect sentencing guidelines range.

No. 11-30908

"The Supreme Court has held that, if 'the district court misapplied the [g]uidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, . . . that the error did not affect the district court's selection of the sentence imposed." *United States v. Waskom*, 179 F.3d 303, 312 (5th Cir. 1999) (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992)). We do not conclude that, on the record as a whole, the district court's error did not affect its selection of the sentence imposed.

In *Waksom*, we held that "[a]lthough Waskom's sentence falls below the corrected guideline range [because of the sentencing judge's significant downward departure], we cannot conclude that the [sentencing guidelines] error was harmless." *Id.* at 312. "We cannot discern from the record whether the sentencing judge would have imposed the same sentence had he been departing from the range set by an offense level of thirty-two, instead of thirty-five." *Id.* (citing *United States v. Bush*, 70 F.3d 557, 560 n.3 (10th Cir.1995) (ruling that an error in calculating the base offense level was not harmless because it might have affected the extent of the downward departure that had resulted in a sentence falling below the corrected sentencing range)).

Similarly, here the record does not reflect whether the district court would have imposed a 136-month sentence had it departed from the 121-151 month range for an offense level of 32, instead of the 235-293-month range for an offense level of 38. While 136 months is the midpoint of the correct range, we cannot assume the district court would not have granted a variance from the correct range because of the speculative nature of the fraudulent contract, or for any other reason. Therefore, the sentencing guidelines enhancement errors were not harmless, and we remand the case to the district court for resentencing.

## CONCLUSION

For the foregoing reasons, we AFFIRM the conviction, VACATE the sentence, and REMAND for resentencing.